## STATE v. BRIDWELL.

No. 2867.    Decided June 28, 1916.    (158 Pac. 710.)

1. BURGLARY—EVIDENCE—SUFFICIENCY. In a prosecution for attempted robbery of a bank, evidence *held* insufficient to connect the accused with the commission of the offense to justify a conviction. (Page 98.)

2. CRIMINAL   LAW—CORROBORATION   OF   ACCOMPLICE—EVIDENCE —SUFFICIENCY. Under Comp. Laws 1907, Section 4862, requiring other evidence which in itself and without the aid of the accomplice tends to connect a defendant with the commission of the offense, in a prosecution for attempted robbery of a bank, evidence *held* insufficient to corroborate the testimony of the accomplice and connect the accused with the offense. (Page 98.)

Appeal from Third District Court, Third District, *Hon. M. L. Ritchie,* Judge.

Richard W. Bridwell was convicted of attempted robbery, and he appeals.

REVERSED and remanded for new trial.

*Marks & Jensen,* for appellant.

*A. R. Barnes,* Atty. Gen., and *E. V. Higgins* and *G. A. Iverson,* Asst. Attys. Gen., for the State.

STRAUP, C. J.

The defendant was convicted of attempted robbery and appeals. He says the evidence is not sufficient to justify the conviction. We think the contention well founded.

The assault was made on a bank at Murray in the daytime, about one o'clock in the afternoon. But one witness, the bank's cashier, testified as to that. He testified that a man with "his face blackened with something sootlike, a black polish smeared over his face," appeared at the bank, thrust a revolver through the wicket, and exclaimed, "Give me what gold you have there!" Instead of handing the money out, the witness instantly dropped to the floor. The perpetrator retreated, "swung" on his horse near by, which the witness but described as a dark grey or brown, and rode away. The witness was asked by the district attorney, and he answered:

"Q. You would not undertake to give any opinion as to the features of this blackened man? A. No, sir. Q. As to the color of his clothes? A. No, sir. Q. And as to whether or not it was this defendant you wouldn't undertake to make any statement? A. No, sir."

On cross-examination he further testified that he saw the man riding the horse on the street, maybe eighty feet away, looked at his face, and had a good side view of him; that he thereafter talked with the defendant, but there was "not a thing" about his voice or appearance to "suggest the thought" that the defendant was the perpetrator.

A livery stable keeper at Salt Lake City, seven miles from Murray, testified that at about 9 o'clock on the morning of the day of the assault the defendant asked for a horse. Being told that the witness had no horse for hire that day, the defendant telephoned to another keeper who, in response thereto, delivered "a little brown mare" at "the Bridwell apartments" in Salt Lake City, for the defendant's use. At about nine o'clock that night the keeper, on a telephone message, got the horse at the same place.

Another witness testified that "somewhere about three o'clock in the afternoon of the day of the attempted robbery the defendant, riding "a dark grey, or a brown, horse, not very large," stopped at his place, about three miles north and about three miles east of Murray, and asked permission to use the telephone. The defendant had "no black on his face," and did not appear to be excited or at all disturbed, and "came in in a very quiet way and asked permission to use my phone."

B., a convict serving time for burglary and robbery, but out of prison on parol, the chief witness for the State, testified that he and the defendant, at different times, discussed and planned the robbery, first to be committed on the 17th and later on the 18th of June, the day the assault was made. The day before they purchased a gun in Salt Lake at a pawnshop. All that day until about ten o'clock at night they planned the robbery. They then went to B.'s home, some distance south and east of Salt Lake City, where the defendant that night slept in B.'s barn. The next morning they came to Salt Lake. The defendant then procured the horse. B. took a street car from Salt Lake in a direction towards Murray, and left the car a little ways north of Murray. There he waited until the defendant rode up with the horse. They then went east about a mile, where they both blackened their faces. The plan was to commit the robbery at the noon hour. There they parted, the defendant on the horse riding south, and B. later taking a car back to Salt Lake. There, representing himself to be a newspaper reporter as talking, he telephoned the bank for particulars of the robbery. Then he took a car and again went south towards, and east of, and about four miles from, Murray, where the defendant soon rode up

and told him of the failure of the enterprise. There B. took the horse, gave the defendant a nickel, and told him to take a car back to Salt Lake. B. rode in the same direction with the horse towards his home. He tied the horse to a tree about a half mile from his home and then walked. Reaching his place, he found the defendant walking towards it instead of going on to Salt Lake. Later they took the horse and retreated in a sort of gulley, where they remained talking the matter over until after dark. B. then took the gun and went home, the defendant, the horse, and rode to Salt Lake.

Another witness testified that somewhere around two o'clock he saw some one—he was not sure whether it was the defendant or not—with B. at B.'s place, about six miles east and north of Murray. He saw them together but a moment, and did not notice where they went or what they did.

The officer who arrested the defendant testified that the defendant told him that he went out with B. to his place the night before the alleged assault, and there slept in his barn, and that the next morning he, at B.'s request, came on to Salt Lake to get a horse for B. to use, as B. told him, to go to his father's place near the river for cattle.

This is the substance of all the testimony of the state's witnesses. It is clear enough that the assault was made by but one man with a blackened face on horseback. B. on his direct examination testified that, while he was not present, yet he aided and abetted in the commission of the offense; but when pressed on cross-examination, and pointed to as himself the perpetrator, testified that he tried to dissuade the defendant from committing the offense, and blackened his face and procured the gun only for that purpose, and to prevent him from committing something worse. The only legal effect to be given B.'s testimony is that he committed the assault or was an accomplice. The most distinguishing feature of the perpetrator was his blackened face. B. testified that his face was blackened. Unless he was the perpetrator, he gave no reason or occasion for blackening his face. He, however, testified that also the defendant's face was blackened. But that rests alone on B.'s testimony. No other witness testified to that. There is no direct evidence whatever to connect the de-

fendant with the commission of the offense, except the testi-
mony of B.    There, of course, are other suspicious circum-
stances.    The perpetrator rode a dark grey or brown horse.
The defendant that day hired a brown mare, which was deliv-
ered for his use at the Bridwell apartments.    The defendant
was acquainted with B., a paroled convict.    He was at his
place the night before the commission of the assault, and was
seen at his place in B.'s company the next day and shortly
after the commission of the offense.    But except B. no witness
saw the defendant with or without a horse within six miles of
the place of the assault, and then after, but not before, the
commission of it.    B. testified that he himself, shortly after
the assault, rode and used the horse; the officer, that the de-
fendant told him that he got the horse at B.'s instance and for
his use to go to his father's place for cattle.    These may all
be suspicious circumstances, but do not, within the require-
ment of the statute (C. L. 1907, Sec. 4862) constitute—
"other evidence which in itself, and without the aid of the
testimony of the accomplice, tends to connect the defendant
with the commission of the offense."

Eliminating for this purpose the testimony of the accom-
plice, and pointing alone to these circumstances, they but
show that the perpetrator, at one o'clock, rode up to and away
from the bank on a dark grey or brown horse, and that the
defendant, six miles away, about three o'clock, was seen rid-
ing a dark grey or brown horse hired by him at nine o'clock,
but do not show that the defendant was that man, or even
that the horse ridden by him at three o'clock was the same
horse seen at the bank at one o'clock.    The description which
the witness at the bank gave of the horse there seen by him
was a very general, and not a specific, description, and one
equally fitting a hundred or more horses.    The witness did
not say that the horse ridden by the defendant was the same
horse, or in his judgment, was the same, as was seen by him
at the bank, or that the one was like, or in appearance similar
to, the other.    Nor did the witness undertake to say that in
apparent height or weight, or in any other particular, the de-
fendant, in any manner, resembled the perpetrator.    If any-
thing, the witness rather negatived that.    It may be said that

the jury on the evidence might have taken the view that B. was the perpetrator, and that the defendant, though not present at the assault, yet aided and abetted, and hence was equally guilty. But to sustain such theory, again must the testimony of B. be looked to. Without it there is not enough evidence to support it. We thus are of the opinion that, independently of the testimony of the accomplice, there is not sufficient evidence to connect the defendant with the commission of the offense. The judgment, therefore, is reversed, and the cause remanded for a new trial.

McCARTY, J., concurs.

FRICK, J.

At the hearing I was of the opinion that upon the whole evidence the jury had a right to infer that the defendant was connected with the commission of the charged offense apart from the testimony of his accomplice. I am, however, in doubt as to that, and I therefore yield to the judgment of my Associates.