## STATE v. LEEK.

No. 5047. Decided December 31, 1934. (39 P. [2d] 1091.)

*K. K. Steffensen*, of Salt Lake City, for appellant.

*Geo. P. Parker*, Atty. Gen., and *L. A. Miner*, Deputy Atty. Gen., for the State.

MOFFAT, Justice.

The defendant, Maurie Leek, was charged by the information in two counts with the crime of forgery. The case comes to this court on appeal from a judgment of guilty and sentence based upon a jury's verdict after trial in the district court of the Third judicial district of the state of Utah, county of Salt Lake. The second count of the information was on motion dismissed by the court at the conclusion of the state's evidence.

Omitting the formal parts of the information, the crime of forgery is charged as follows:

"That the said Mrs. M. Montag, alias Maurie Leek, on or about the 1st day of October, A. D. 1929, at the County of Salt Lake, State of Utah, wilfully, unlawfully, falsely, feloniously, and with intent to defraud *Jack Tannebaum and Abie Tannebaum, doing business in Salt Lake County, Utah, under the name and style of* National Army and Navy Store, *a partnership*, to a certain bank check."

There is then set out in haec verba the check, and the statement "did forge and counterfeit" contrary to the provisions of the statute. (The words in italics are for further reference.)

Many errors are assigned. Three are argued and only those will be considered. The first error assigned and relied upon relates to the court permitting the information to be amended. Appellant contends that the information, as amended, alleges a separate and distinct offense to that charged in the complaint upon which the information is based, and that for that reason the defendant did not have a preliminary hearing upon the charge set forth in the information as amended. The italicized words, "Jack Tannebaum and Abie Tannebaum, doing business in Salt Lake County, Utah, under the name and style of" and "a partnership," were interlined and the information amended accordingly.

It was urged at the trial and is argued here that because of the amendment which the court permitted to be made, the "complaint upon which the defendant was given a preliminary hearing was so vitally and substantially changed * * * that the hearing before the Justice did not amount to a preliminary hearing on the crime charged." Appellant cites that part of section 8680, Comp. Laws Utah 1917, now 105-11-1, R. S. Utah 1933, which requires, among other things, that the complaint must state the person against whom or against whose property the offense was committed, if known, also *State* v. *Pay*, 45 Utah 411, 146 P. 300, Ann. Cas. 1917E, 173.

This court has repeatedly held that an accused may not be tried in the district court upon an information unless

he has either had a preliminary examination, or, with the consent of the state, has waived a preliminary examination of the offense charged, if the objection be timely raised. *State* v. *Hale*, 71 Utah 134, 263 P. 86, and cases there cited. It has likewise repeatedly been held by this court that a defendant may, with the consent of the state, waive preliminary examination, and unless he makes objection before he enters his plea to the merits and before he proceeds to the trial in the district court, that no preliminary examination had been given him, he waives his right to a preliminary examination, and, if conviction follows, he cannot successfully assail the conviction' on that ground. *State* v. *Hay*, 52 Utah 80, 172 P. 721; *State* v. *Gustaldi*, 41 Utah 63, 123 P. 897; *State* v. *Sheffield*, 45 Utah 426, 146 P. 306, 308.

It is also true that unless one has had a preliminary hearing or has waived it, with the consent of the state, he may not be committed to the district court for trial upon a complaint charging one offense and then be charged and tried upon an information charging an offense other than or different from the offense charged in the complaint upon which the information is based, unless it is an included offense. *State* v. *Pay*, supra; *State* v. *Sheffield*, supra; *State* v. *Hale*, supra.

In the instant case, forgery was charged in the complaint, forgery was charged in the information, and it was forgery of which the defendant was found guilty. No complaint can be made upon the ground of difference of offense charged. While the statute, 105-11-1, R. S. Utah 1933, does require the complaint to state "the person against whom or against whose property the offense was committed, if known," there is no requirement that the complaint shall state that the name of the person against whom or the description of the property shall be inserted. The fact that the "Army and Navy Store" was named as the person against whom or against whose property the offense was committed does not destroy the efficacy of the complaint

as regards stating a public offense. No one was misled by the allegation, and, when the amendment was made, had it been made to appear to the satisfaction of the court, and made a part of the record, and had the defendant so shown cause or reason why he was prejudiced or should not proceed with the trial, the court would have given the accused such reasonable time as might have been necessary to meet any new matter set up in the amendment. *State* v. *Jensen* (Utah) 30 P. (2d) 203. The new matter added, if it may be called new matter, was in amplification of, or making more certain, that which had already been alleged. It would further appear that in such charge, as in the instant case, where the alleged forged document is set out in haec verba, that the allegation, as made or as amended, is immaterial. 105-21-11, R. S. Utah 1933, provides:

"When an offense involves the commission of, or an attempt to commit, a private injury, and has been described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, shall not be material."

Section 8781, Comp. Laws Utah 1917, now 105-17-3, R. S. 1933, among other things, provides:

"An information may be amended, without leave of court, in any matter of form or substance at any time before the defendant pleads thereto. It may also be amended in any matter of form or substance, by leave of court, at any time after the defendant has pleaded to the merits, or during the trial."

No substantial variance is shown, the identity was made more certain, any inaccuracy, if it existed, was not misleading. The amendment was properly allowed. *State* v. *Chipman,* 40 Utah 459, 123 P. 89; *State* v. *Brown,* 39 Utah 140, 115 P. 994, Ann. Cas. 1913E, 1; *State* v. *McKee,* 17 Utah 370, 53 P. 733.

The second assignment argued is that there is not sufficient evidence independent of the testimony of an accomplice which tends in any way to connect the defendant with the commission of the crime charged. The evidence dis-

closes that the defendant, with her family, lived next door to the family of Christian H. Fischer. The Utah Power & Light Company mailed dividend checks to ■ Christian H. Fischer and other members of his family, five in all. Three of these checks came into the hands of the defendant. The offense charged is that the defendant forged the name of Christian H. Fischer on the back of the check made payable to him.

Lima Arnold, an accomplice, testified that on October 1, 1929, three checks came into possession of the defendant, whether by misdelivery or by taking them from the mailbox is not made clear. Later in the afternoon of the same day the defendant and the witness, Lima Arnold, rode uptown in an automobile driven by Frank Willis, who also made his home with the family of the defendant, as did Lima Arnold. They drove to Regent street, and, after arriving there, the defendant asked Lima Arnold, the witness, to go into the post office station and procure a pen and ink. The witness, Lima Arnold, further testified that she went into the post office, brought out a pen and some ink, and, while the defendant was sitting in the automobile, she saw her write the name of Christian H. Fischer upon the back of the check payable to him. She also testified she saw the defendant indorse the other two checks. Immediately after the checks had been indorsed, the witness, Lima Arnold, returned the pen and ink to the post office and then went back and got into the car with defendant. They then drove down State street to between Second and Third South streets and Lima Arnold, upon the request of the defendant, went to the Army and Navy Store, made some purchases, indorsed the check upon which the defendant had signed the name of Christian H. Fischer by signing on the back thereof the name "Anna Harding," tendered the check and received something over $30 in cash as change, the check being for $35. Two purchases were made at the time the check was cashed, one a polo shirt, the other some armlets. The defendant then in company with Lima Arnold was driven to Beckstead's Gro-

cery Store at Ninth South and State streets where one of the other checks was used to make a purchase, receiving the balance in cash. The third check was cashed at Holter's Market on 27th South and State streets in a similar manner, purchasing some groceries. Each time the change was given to the defendant. In cashing the checks, Lima Arnold indorsed them, respectively, "Anna Harding," "June Mahi," and "Burl Davis."

There was further evidence to the effect that after the forgery had been discovered, a post office inspector asked the defendant to write the name of Christian H. Fischer on a piece of paper, as well as some other names, which the defendant did. This paper, containing the admitted handwriting of the defendant, was offered and without objection received in evidence as the admitted handwriting of the defendant. A handwriting expert was shown the paper containing the admitted handwriting of the defendant and the check upon which the witness, Lima Arnold, had testified to having seen the defendant write on the back thereof the name of Christian H. Fischer. He stated that in his opinion the writing in both instances was done by the same person.

That an accused may not be convicted upon the uncorroborated testimony of an accomplice is provided by statute and has been affirmed by this court in numerous cases. 105-32-18, R. S. Utah 1933, provides:

"A conviction shall not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient, if it merely shows the commission of the offense or the circumstances thereof."

The following cases have discussed the necessity for corroboration: *State* v. *Baum*, 47 Utah 7, 151 P. 518 (a larceny case; corroboration insufficient) ; *State* v. *Bridwell*, 48 Utah 97, 158 P. 710 (attempted robbery; corroboration sufficient).

In our opinion, the testimony of the expert on handwriting, based as it was upon an admitted sample of handwriting and a comparison thereof with the writing upon the questioned document, is with the surrounding circumstances sufficient corroboration of the testimony of the accomplice to warrant the court in permitting the case to be submitted to the jury. This evidence tends to connect the defendant with the commission of the offense and, if believed by the jury, to support their verdict. Upon this assignment, the appellant must fail.

The third and last error asserted in the separate assignments argued relates to rulings of the trial court in permitting counsel for the state to interrogate Frank Willis, a state's witness, by direct and leading questions in the nature of cross-examination, and in receiving in evidence certain checks claimed to be forgeries, and a written statement purporting to have been made and sworn to by the witness and for the purpose of impeachment of the state's own witness.

The writing, after referring to two of the three checks involved in the controversy, only one of which is contained in the charge, is to the effect that on October 1, 1929, the witness, with Mrs. Montague (Maurie Leek), the defendant, Lima Arnold, and a child called "Buster," drove to and stopped in the vicinity of Pioneer Station on Regent street; that Lima Arnold got out of the car and went around the corner to some place not known to the witness; that when she returned to the car and got in "Mrs. Montague was observed by me writing with a pen on some paper about the size of a check or envelope." Before the presentation of the writing from which the above quotation is made, and referred to in the record as Exhibit 7, Frank Willis was produced as a rebuttal witness by the state. After some preliminary questions covering matters about which other witnesses had testified and carried on largely by leading and suggestive questions, the witness was asked and answered the following questions:

"Q. And did you stop by the Post Office on Regent Street? (To an objection that the question was leading the court said: "He may answer, it is leading." Presumably because harmless.) A. We parked on Regent Street by the Volunteers of America Store.

"Q. How far is that from the Post Office on Regent Street? A. That may be south three-fourths of a block.

"Q. Do you know whether Lima got out of the car there? A. She got out of the car and went into the store of the Volunteers of America.

"Q. Do you know whether she went into the Post Office? A. No, sir.

"Q. While you were standing in that vicinity did you see Mrs. Leek write on any papers with a pen? A. No, Sir.

Q. On this day? A. No, she was—there was no writing, whatever, if she had anything in her hand she had her grocery list.

"Q. If she had anything it was her grocery list? A. Yes, she had her grocery book or grocery list.

"Q. You saw her writing with a pen? A. She wasn't writing with a pen."

Thereupon the district attorney stated to the court that he was surprised "with the witness' attitude and will ask the privilege of cross-examination." Counsel for defendant objected. Thereupon and without further showing, the court remarked: "It is apparent that the witness is adverse." Exception was duly taken and counsel for the state then proceeded to cross-examine the state's own witness, and, as a part of that cross-examination, offered for the purpose of impeachment the writing above referred to. The witness testified that he had made a statement to Mr. Dutton, the post office inspector, that the signature on the exhibit was his; that he had read part of the document before signing it, but may not have read it all so as to understand it; that he had not told Mr. Dutton he had seen the defendant writing with a pen or pencil; that he had not seen her in the act of writing at all; that he could not swear she was writing. Counsel for the prosecution then continued: "I am going to ask you again, didn't you at that time tell Mr. Dutton and didn't you put in your sworn statement, 'Mrs. Montague was observed by me writing with a pen on some paper about the size of a check or envelope?'" Before the witness

answered, counsel for the state asked: "You followed what I was reading here, didn't you?" To which the witness answered, "I see what he has got there." After some questions as to the signature which was admitted, the writing Exhibit 7 was received in evidence over objection.

What ground existed, if any, for the charge that the witness Frank Willis was an adverse witness to the state's cause does not appear. If the witness manifested an attitude by appearance, manner of speaking, emphasis, bitterness, or bias, such matters are open for observation to the trial court while a witness is testifying; in the instant case none of such matters can be gathered from the record. Whether or not counsel for the state had interrogated or conversed with the witness before placing him on the witness stand does not appear. If counsel had possession of the document used for impeachment purposes, he may have assumed the witness would so testify. He may not, however, rely upon such presumption when he finds himself disappointed, then impeach his own witness without making a showing justifying such procedure. Nothing was referred to the court to show upon what ground the testimony of the witness caused surprise. Counsel said he was surprised. No doubt he was, but was that because he had not ascertained in advance as to what the witness would testify to, or had the witness deliberately misled counsel? Nothing appears from the record from which it may be determined that the witness was actually adverse. It may be and sometimes is necessary to call a witness known to be adverse or hostile. The very nature of the situation may be such that it is necessary to call the adverse party. One may be misled or entrapped by an adverse party or witness. If such be the case, the fact should be shown. In the instant case, no such situation was shown, and no reason offered why the witness was called or in what particulars the behavior of the witness caused surprise. *Sturgis* v. *State,* 2 Okl. Cr. 362, 102 P. 57, 68; *Culpepper* v. *State,* 4 Okl. Cr. 103, 111 P. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668;

*People* v. *Jacobs*, 49 Cal. 384; *In re Estate of Dolbeer*, 153 Cal. 652, 96 P. 266, 15 Ann. Cas. 207.

The general rule, subject to certain exceptions, is that a party cannot impeach a witness he has himself called. Thompson on Trials (2d Ed.) § 511. Many reasons for the rule have been stated. It is not necessary to repeat them here. Many, if not all, of the matters set forth in the statement could have been testified about directly by the witness, being matters of observation, had he observed them; but that does not relieve them from the objection of being hearsay, particularly when the witness makes a different statement and repudiates the alleged former statement. Here the impeaching document was especially damaging as the very thing sought to be established by the document was corroboration of the accomplice requiring direct evidence, which was sought to be secured by way of impeaching one's own witness. The fact that the witness stated out of court certain matters which, if competent proof, would tend to show defendant's guilt, does not establish the existence of such matters as facts. After counsel, and for that matter the court, had discovered that the witness was not inclined to help the cause of the state or did not intend to testify to anything adverse to defendant's cause, it was improper for the district attorney to pursue the examination and thereby secure affirmative testimony prejudicial to the state and then make use of the situation thus created for the purpose of securing by impeachment affirmative testimony favorable to his cause by showing that the witness had made statements out of court and out of the presence of the defendant, although written, which were prejudicial to her.

For a further discussion of this matter the case of *State* v. *Treseder*, 66 Utah 543, 244 P. 654 (and it is suggested that the Pacific Reporter citation be consulted rather than the Utah Report because of certain misprinting in some of the volumes of the Utah Reports, except as corrected by errata), in which the case of *State* v. *Scott*, 55 Utah 553,

188 P. 860, is referred to and attention is especially called to what is said in the Treseder Case on the subject of a witness giving surprise testimony, and "that it must also be made to appear that the party calling the witness was prejudiced by the testimony which the witness gave."

Whether the jury would have found as they did without this testimony or the exhibit is only a matter of conjecture. Certain it is, however, that there were matters there that may have been the preponderating factors in arriving at their verdict. It was prejudicial error to receive the statement, Exhibit 7, in evidence.

The court over objection admitted two other checks in evidence, the indorsements upon which the accomplice testified were written by the defendant at the same time as the indorsement upon the check for the forgery of which defendant was on trial. These two checks were allegedly offered for the purpose of showing intent, notwithstanding the statement of counsel for defendant to the effect that if it were proved that defendant indorsed the check upon which the charge was based, that it was done with criminal intent. Defendant's position was that she did not indorse the check at all.

The general rule is that evidence of other or similar offenses than the one charged is inadmissible. The authorities are not in complete harmony upon the subject and there are some well recognized exceptions to the rule.

"Where from the nature of the evidence under inquiry, proof of its commission as charged carries with it the evident implication of a criminal intent, evidence of a perpetration, or attempted perpetration of other like offenses will not be admitted." 8 R. C. L. 206.

In 16 C. J. 589, it is said:

"Where the question is whether a certain act was intentional or was done by accident or mistake, evidence to show that the accused intentionally committed similar acts is relevant to show intent. On the other hand, where the nature of the offense is such that proof of its commission as charged carries with it a presumption of criminal intent, evidence of the perpetration or attempted perpetration of other like offenses is inadmissible."

In the case of *Skeen* v. *Craig*, 31 Utah 20, 86 P. 487, 490, in construing what is now 103-1-19, R. S. Utah 1933, we find the following pertinent discussion:

"Section 4068. Rev. St. 1898, which is declaratory of the common law, provides that 'in every crime or public offense there must exist a joint operation of act and intent.' It is also a recognized rule of the common law that the intent, which is such a necessary element of crime generally, is the intent to commit an act or to do something which the law denounces as a crime, regardless of the motives the accused may have had for doing the wrong. In other words, as stated by a noted author on Criminal Law, 'the intent required is, not to break the law, but to do the wrong.' 1 Bishop, Crim. Law, 300. And again, in section 343 of the same work, the writer, after excepting from the rule a certain class or kind of crimes, to which the offense under consideration does not belong, says: 'If a man intends to do what he is conscious the law, which every one is conclusively presumed to know, forbids, there need be no other evil intent. As already stated, it is of no avail to him that he means, at the same time, an ultimate good.'

"And the rule is equally well settled that intent will be presumed from the criminal act; that is, the act itself is evidence of the intent. 8 A. & E. Enc. L. (2d Ed.) 286; 12 Cyc. 152. There is this exception, however, to this general rule: When one, honestly acting under a supposed state of facts, is led into doing that which the law declares to be a crime, but which would have been innocent had the facts been as he supposed them to be when he committed the act, a conviction cannot be had, because, under such a state of facts, the criminal intent is wanting. Bishop, Stat. Crim. 132; *People* v. *Monk*, 8 Utah 35, 28 P. 1115. Nor does the rule apply in cases where an act becomes criminal only because of the existence of a specific intent which the law makes the gist of the offense."

The instant case is not one where there was any defense such as accident or mistake or express or implied authority in the indorsement of the check. Neither does the case come within an exception to the general rule where evidence of a similar offense may be given to show scienter or guilty knowledge or motive. In discussing such exception, 16 C. J., at page 599, says:

"Evidence to show motive prompting the commission of the crime is relevant and admissible notwithstanding it also shows the commission of another crime of a similar or dissimilar character. Thus

it may be shown that the crime charged was committed for the purpose of concealing another crime, or to prevent accused of being convicted of another crime. However, for evidence of another crime to be admissible to prove motive it is necessary that it fairly and directly tends to prove motive growing out of the collateral crime, evidence of another crime which has no connection with that for which the accused is on trial and which therefore is not relevant to prove motive, cannot be introduced, under the guise of proving motive."

Nothing is made to appear that would bring the other two checks alleged to have been forged on the occasion of the forging of the signature on the one for which defendant was on trial, within any of the exceptions. The forging of the name of the payee on the back of each check was a separate offense for which prosecution would lie, and a charge for any one of such offenses would not be a bar to a prosecution upon any other of the offenses chargeable therefor.

In this case the defendant admitted that if the act were proved, the intent would be sufficiently shown. The defendant was not admitting the signing of the name and then offering some excuse, authority, mistake, or defense therefor; but was denying and did deny the writing entirely.

We find no basis within the rule or any of the exceptions making the admission of the other checks alleged to be forged admissible. Each of the other two checks offered and received in evidence was payable to a different payee, cashed at a different time and at a different place, and by different persons than the check, the forgery of which the defendant was charged with.

We think it was prejudicial error to admit in evidence the checks. They tended to prove other separate and distinct offenses. For the reasons stated the judgment of the trial court is reversed and the cause remanded with directions to grant a new trial.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.