## MORTON v. HOOD.

No. 6519.  Decided November 23, 1943.  (143 P. 2d 434.)

*Stewart, Stewart & Cannon,* of Salt Lake City, for appellant.

*McCullough & Ashton,* of Salt Lake City, for respondent.

McDONOUGH, Justice.

Defendant appeals from a judgment entered on a verdict in favor of plaintiff in an action for personal injuries. Numerous errors are assigned as grounds for reversal. We shall direct our attention first to the contention that the court erred in denying the defendant's motion for directed verdict.

Mrs. Gertrude Morton, 61 years of age, on the night of September 28, 1940, while crossing highway U. S. 91 north

of Springville in company with her 16 year old grand-daughter, Gretta Churchill, was struck by the left front fender of an automobile driven by the defendant E. E. Hood. According to the testimony of plaintiff they had been to the skating rink at the Park-Ro-She resort west of the highway and had gone to the east side of the highway to catch a bus when they saw the electric train go north which indicated to them that they were too late for the bus. They were retracing their steps from the east to the west side of the highway when the accident occurred. Gretta was walking two or three feet ahead of plaintiff. Plaintiff testified that she looked to the south as she went onto the highway, and that she saw cars coming from the south about two blocks away; that as she crossed the center double line she looked to the north and stopped, although she saw no car approaching which would endanger continuation of her crossing over to the west side. She stated that as she turned to look toward the south she saw approaching from that direction a car (which proved to be the car driven by defendant) crossing over the middle line into the first traffic lane on the west of the double line; that she was too frightened to move or to see anything else; that the car just seemed to come from nowhere which struck her. Although her right leg was more severely injured than her left leg she denied that she was facing east at the time she was struck by the Hood car.

Some witnesses for plaintiff estimated the speed of the Hood car anywhere from 40 to 60 miles per hour, in a 50 miles per hour zone. Some of the witnesses testified that after Mrs. Morton was hit, she was found lying in the lane immediately east of the center double line with her legs extending across such line. One witness testified that he saw two cars suddenly swerve to the east and then that he saw a woman run across the highway to the west. The woman was subsequently identified as Gretta Churchill, age 16. There were various estimates as to the distance the Hood car traveled after Mrs. Morton was hit, ranging from 75 feet to 175 feet; but the measurements taken by the local

officer showed the rear end of the Hood car stopped 46 feet northeast of the point of impact.

Defendant and some of his witnesses testified that he was driving at a speed not in excess of 35 miles per hour; that he had just left the "safety banquet" of the company by which he was employed; that he did not at any time cross over the double line; that Mrs. Morton turned and ran to the east of the double line directly into the path of his car; that he turned sharply to the right while applying the brakes; that the brakes were in good working order that Mrs. Morton ran into the left front fender; and that when she fell she was lying in the middle of the lane immediately east of the double line.

Defendant argues that his motion for directed verdict should have been granted for the reason Mrs. Morton was guilty of contributary negligence as a matter of law in crossing the highway at a point where there was no pedestrian lane when she saw cars approaching, in hesitating or stopping on the highway when she knew she could proceed across to the west side in safety; that the plaintiff failed to prove by competent evidence either excessive speed or negligence on the part of defendant. However, the evidence was in conflict as to how plaintiff acted in relation to the surrounding circumstances, the direction in which she was going at the time, as to where she was when hit, the location of the Hood car, and other matters. We cannot say, therefore, that the conduct of plaintiff constituted negligence as a matter of law, particularly when viewing it from the standpoint of the testimony of plaintiff and her witnesses. No error was committed in denying the motion for a directed verdict.

Some of the alleged errors most strenuously urged by defendant relate to the refusal of the court to permit counsel for defendant to impeach the testimony of Gretta Churchill by proof of prior inconsistent statements. Several days previous to the time when the case was submitted to the jury, counsel for defendant had a subpoena issued to compel

Gretta Churchill's attendance in court. It appears that two days after the accident she had given statements in an interview conducted in the presence of a court reporter which would constitute evidence highly favorable to defendant. When the process server was unable to find her at home or at school he learned that she had been taken out of school at the time trial commenced and that she had left town. When counsel for defendant learned of the seeming efforts to keep Gretta out of reach of the process server he requested that plaintiff inform him where Gretta was at that time. He stated as his reasons for making such demand that she was a material witness, a member of plaintiff's household, and he recited the facts of her departure. Counsel for plaintiff and the father of Gretta, who was present at the trial, both professed to know nothing as to her whereabouts other than that she had left home.

Counsel for defendant insisted that a continuance be granted until plaintiff could locate the girl because she was in possession of material information as to what occurred. There was no attempt upon plaintiff's part to make a disclosure until the court indicated that a continuance would be granted, when defendant was informed that the girl was in Magna staying at the home of daughter of plaintiff. There she was subpoenaed. Chief counsel for plaintiff went to Magna and interviewed the girl, and she was subsequently produced in court, and was called as a witness by defendant. It is contended that the witness was not only kept out of the reach of the process server by previous arrangement by some one acting on behalf of plaintiff, but that when she was subpoenaed she was kept in the company of those interested in the plaintiff so that counsel for defendant was afforded no opportunity to interrogate her as to her previous statements as to how the accident occurred. When she first took the witness stand the court denied defendant permission to ask her leading questions on the ground that she was not shown to be an adverse witness, but "very cooperative." Following a discussion between court and coun-

sel in chambers after she gave some testimony which tended to corroborate the testimony of plaintiff, the court permitted cross-examination by counsel for defendant.

Counsel asked her about statements allegedly made by her in the presence of a stenographer who was a court reporter at the Lehi hospital two days after the accident. While she did not deny making such statements, she responded that she did not "remember." On cross-examination by counsel for plaintiff she was permitted to explain that she was so excited and upset that she could not remember what was said. Defense counsel asked for leave to impeach her testimony by proving that such questions were asked and such answers were actually given by her and recorded by the reporter, which showed that the accident happened in a manner materially different from the manner described by plaintiff's witnesses, and made proffer of proof of such statements.

The court denied the request and sustained plaintiff's objection to the proffered testimony on the ground that it was not permissible to call a witness to prove something and then tear down such proof as given and "make a liar" out of a witness whom counsel himself has called to testify. While on the witness stand Miss Churchill said she remembered events up to the time of the accident, and that she and her grandmother were in the act of crossing the highway to the west when the accident occurred; that she stopped when she got about two feet west of the center double line and looked to the north and saw her grandmother was two or three feet to the east; that when she took a couple of steps forward she saw the car approaching and jumped to the west to get out of its way; that she knew her grandmother must have been hit. The testimony in general tended to corroborate that presented by plaintiff. If the answers to questions given by her on September 30, 1941, were established as contended by counsel for defendant, such answers would tend to show that her grandmother was running toward the east saying "Here comes the bus," and that she

was not west of the double line when the accident occurred. If permitted, such impeachment might destroy all effects of her corroboration of the testimony given by her grandmother. Respondent contends that because she did not expressly deny making those statements but merely said she did not recall or could not remember, such testimony was not subject to impeachment.

Thompson on Trials (2d Ed.), Sec. 507, contains a statement, which we approve, of the rule applicable when a witness claims he does not remember:

"* * * A witness cannot, by answering that he has no recollection of having made the former statement imputed to him, defeat the right of the impeaching party to prove that he did make such statement. For like reasons, where the witness neither admits nor denies, on his cross-examination, that he has made a certain declaration, or given certain testimony, contrary to that which he has given on the witness stand, the adverse party may, by subsequent testimony, prove the fact."

See, also, Sections 512, 513 and 515.

Although the rule is definitely applied in criminal cases, there is good authority for not restricting it to such cases. In *State* v. *Haworth*, 24 Utah 398, 68 P. 155, a witness refused to answer when confronted with an alleged prior inconsistent statement, and this court held that it was proper to produce in evidence such alleged inconsistent declarations. As far as the ultimate result is concerned, we see little difference between refusal to answer on the one hand and a declaration of a witness on the other hand that he does not. remember. In *State* v. *Inlow*, 44 Utah 485, 141 P. 530, Ann. Cas. 1917A, 741, we held that in case of surprise, the recollection of the witness may be refreshed. In *Woodward* v. *Spring Canyon Coal Co.*, 90 Utah 578, 63 P. 2d 267, the refusal of the trial court to permit the recollection of a child 7 years of age to be refreshed by calling attention to his prior testimony, was upheld as within the sound discretion of the court. In *State* v. *Treseder*, 66 Utah 543, 244 P. 654, the case of *State* v. *Scott*, 55 Utah 553, 188 P. 860, was held

not to lay down the rule that a party may prove the prior inconsistent statements of the witness under all circumstances nor lay down any rule as to when or under what circumstances the contradictory statements may be proved. In the Scott case it was held that the district attorney had not shown surprise, but mere disappointment in that the witness had not testified just as he had expected. In *State v. Leek*, 85 Utah 531, 39 P. 2d 1091, it was held that as a general rule a party may not impeach his own witness by proving a prior contradictory statement without showing that he has been misled or entrapped.

In this case there seems to be ample showing that counsel for defendant was misled and entrapped. The absence of the young witness from her home and the evident conscious effort to withhold information as to her whereabouts appeared to be for the purpose of shielding her from the service of subpoena. These circumstances would tend to show that if she did testify her testimony would be favorable to defendant. There was a further circumstance in this case which suggests the probability that in keeping her from being contacted by defendant or his counsel, she was being contacted by persons who did not want her to give testimony unfavorable to plaintiff. While it was obvious to counsel that the fact that she resided with her grandmother would tend to make her reluctant to testify as to matters which might be unfavorable to her grandmother, counsel was not compelled to assume that she would give testimony which would be almost diametrically opposite to her former statements.

As indicated by Wigmore, the purpose of calling a witness is to reveal the facts within the knowledge of such witness, and a statement by a witness shortly after the happening of an event may be more accurate and more reliable than the recollection some time later and particularly after the recollection of the person has been colored by subsequent events and interests. As he points out the only real danger in impeachment of one's own witness by proof of prior

contradictory assertions, may arise if such impeachment of the testimony is so used as to make the impeaching evidence substantive testimony. The proof of prior inconsistent statements does not necessarily degrade a witness nor show he is untruthful or that his reputation for truth and veracity is bad; for such impeachment is not designed to degrade the witness nor prove the character of the witness is questionable, but to overcome the effects of his testimony favorable to the adverse party by showing he had a materially different recollection of events on a prior occasion. See III Wigmore on Evidence, 3rd Ed., Secs. 896-905.

Since the purpose of a trial is to disclose the truth and receive competent proof of material and relevant facts, we do not believe a witness either intentionally or unintentionally should be permitted to prevent disclosure of material facts nor to evade impeachment by refusing to answer, or merely to say that he does not remember. If permitted to function, a convenient memory could readily defeat proof of prior contradictory statements and testimony given at a time when the witness would be more likely to remember how things happened with a greater degree of accuracy.

We are of the opinion that when a witness has made statements on a prior occasion which would induce counsel acting in good faith to call such person as a witness, and when testifying such witness gives testimony materially different from the prior statement; the party so surprised and misled by such adverse testimony, under proper circumstances, should not only be permitted to ask leading questions to refresh the recollection of the witness as to the prior declarations, but if the witness asserts that such questions or reference to alleged prior declarations do not refresh his memory, or he denies making such statements, or refuses to answer, or even professes that he is unable to remember; proof of such prior statements should be received, not as substantive evidence of the facts about which such statements were made, but to offset the effect of the surprise adverse testimony.

In this case we think it is quite apparent from the statements of respective counsel, and by the events which transpired which operated to make it so difficult to procure Gretta Churchill, that she was adverse to giving any testimony which might prevent her grandmother from recovering, although it appears to have been known ▪ to counsel on both sides that two days after the accident she made statements as to how it occurred which would prove beneficial to defendant. Under the circumstances counsel for defendant was entitled to have the reporter who recorded her statement testify as to the questions propounded to Gretta Churchill and the answers allegedly given by her two days after the accident. The denial of the right of impeachment on such a material matter was in the present case, we are confident, prejudicial error which necessitates reversal of the judgment.

Error is also predicated upon the court's refusal to permit a witness called by defendant to testify as to the alleged expressions and utterances of Gretta Churchill made immediately after the accident occurred, on the ▪ ground it would be hearsay and also improper impeachment of the testimony of Gretta Churchill who said she was unable to remember what was said. The defendant then proffered proof that Gretta ran into the skating rink immediately after the accident, called the attendant in the cage and while weeping excitedly told the woman her grandmother had been hit while running across the highway to catch a bus, and that Gretta herself tried in vain to stop her. The proper foundation was laid to show the statements were made without solicitation, as spontaneous expressions concerning what she had just experienced. They were proffered in evidence as res gestae and as impeaching evidence.

It was error for the court to exclude such testimony. It was clearly admissible under the "spontaneous exclamations" exception to the hearsay rule, as testimony to the fact spoken of. It was substantive proof, and not mere impeachment. Although it appears that defendant has not specific-

ally assigned error for refusal to admit such evidence as res gestae, he treats it in his argument of other alleged errors, particularly in connection with the right to impeach Gretta Churchill as to her testimony that she was not able to remember statements made by her after the accident because she was too excited, hysterical and "so terribly upset." Owing to the fact that the judgment must be reversed on the ground above mentioned we take occasion to state that the exclusion of such testimony was error.

As stated by this court in the case of *Balle* v. *Smith,* 81 Utah 179, at page 198, 199, 17 P. 2d 224, at page 232:

"* * * While the trial court has a wide discretion in the admission of declarations of this character, and should be fully satisfied by evidence that a statement claimed to be res gestae comes within the rule and meets all the requirements thereof, yet where, as here, it is apparent the declaration does meet all the requirements and should have been admitted, it becomes our duty to so declare and to reverse the judgment so that on a new trial the jury may have the benefit of such testimony."

Speaking of the general principle of this exception to the hearsay rule, Professor Wigmore explains in VI Wigmore on Evidence (3rd Ed.), Sec. 1747:

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. The ordinary situation presenting these conditions is an affray or a railroad accident. But the principle itself is a broad one."

The proffered testimony unquestionably met every test of admissibility under this principle. See Wigmore, op. cit. Sec. 1750. Miss Churchill's own conclusion expressed at the trial that she was so hysterical and upset as to be practically out of her mind at the time she ran over to the skating rink is suggested by counsel for plaintiff as a reason for excluding the evidence; on the contrary, the attendant circumstances were the very foundation upon which its admissibility could be planted.

Other errors are assigned to which we deem it advisable to advert. Several are directed at instances of alleged misconduct upon the part of counsel for plaintiff; others at purported improper remarks by the court.

The trial was conducted so much on the order of a personal feud between counsel, that a question might very well arise as to whether such conduct obscured the attention of the jurors to material testimony and other evidence. Owing to the fact that the judgment must be reversed and a new trial granted, we need not decide whether the improper conduct of counsel on either side in itself would require the court to declare a mistrial, so we reserve for future determination whether the examples of alleged misconduct constitute reversible error. As a warning against such tactics and the fact that we may be called upon to rule thereon, we call attention to practices of counsel during the course of the trial which prudent and competent attorneys would know to be contrary to fair trial practice and which deprive the court procedure of the decorum which should characterize a trial.

The exclusion rule was invoked so that one witness would not hear the testimony of other witnesses. There were repeated instances of coaching of witnesses. A number of times leading questions were asked on direct examination which were objectionable for the reason that they were obviously intended to furnish the very answers desired. Even after such questions were withdrawn and questions framed in proper form, counsel had accomplished their pur-

poses, for it would require no guesswork for witnesses to know just what answers were sought. On cross-examination witnesses were coached frequently by objections which were made in such improper form as to advise witnesses in some instances that others had testified differently or to indicate that certain answers would not be suitable. Thus the purpose of the rule of exclusion was nullified by counsel.

On numerous occasions objections were made in such form as to argue to the jury or to attempt to create prejudice against the opposing counsel. Objections were followed at different times with the statement, "and I assign the same as prejudicial error on the part of opposing counsel." Such statements were wholly unnecessary to enable the court to rule on the objections interposed and, made in the presence of a jury, were definitely improper.

On frequent occasions also, objections to questions were promptly followed by arguments which were wholly unnecessary to support the objections, and which could serve no apparent purpose except to argue the case to the jury while evidence was being presented. Counsel for each party seemed quite disposed to argue each point of law and each item of conflict in evidence on the slightest pretext, so that the case was argued many times before it was finally submitted to the jury.

Many assignments of error relate to alleged improper remarks of the trial court. It is improper for a trial court to comment on the evidence beyond what is clearly essential to support the rulings of the court on objections or motions. In this case, while we do not approve the remarks or comment of the trial judge made in the presence of the jury, it appears that some of them were provoked by conduct bordering on contumacy of counsel on both sides at various times. There was nevertheless, at times, a lack of judicious restraint upon the part of the trial court—this too largely caused by the conduct of counsel—which might lead the jury to believe that the trial judge had a conviction as to the merits of the controversy. On a retrial of the case

we see little likelihood that there will be any recurrence of the remarks to which objections are urged, and for that reason we find no occasion for making further reference to them.

The judgment is reversed and the cause is remanded to the district court, with directions to grant a new trial. Costs to appellant.

WOLFE, C. J., and LARSON, J., concur.

MOFFAT, J., concurs in the judgment of reversal.

ELLETT, District Judge (dissenting).

I dissent. As I read the majority holding, the case is re-manded because of two errors committed during the course of the trial. These two errors relate to testimony that tended to impeach a witness called by the defendant. The witness in question was Gretta Churchill, who was the granddaughter of the plaintiff in the action.

This witness was a girl sixteen years of age, and shortly after the accident the attorney for the defendant, with an ex court reporter, went to the hospital where the girl's grandmother lay critically ill, and there secured some sort of a statement undoubtedly as favorable to the defendant's cause as the learning and skill of an experienced lawyer could secure from an inexperienced girl under such circumstances.

The defendant did have some difficulty in securing the attendance of Gretta Churchill as a witness in court, but the trial court gave sufficient continuance until her presence could be obtained by process; and when she took the witness stand and did not testify as counsel for the defendant desired her to do, he then sought ways and means of putting the statement he had elicited from her at the hospital into the record and before the jury. The court permitted him to cross-examine and lead the witness but would not permit him to impeach her testimony, and in doing this I consider that no error was committed. The defendant vouched for her truth and veracity when she was placed under oath and

took the witness stand. Thereafter to permit him to impeach her and show that she was unworthy of belief under oath by having the ex court reporter read the questions and answers propounded to her in the hospital goes further than the law allows. In England and a number of the states statutes have been passed permitting a party to impeach his own witness under circumstances such as the defendant's attorney claimed to exist in this case. However, until our Legislature has spoken on the subject, I believe that we should stay with the law as it has been laid down in the decided cases.

Counsel for the defendant offered the conduct and words of Gretta Churchill immediately following the accident in evidence, not as spontaneous exclamations and a part of his defense, but solely as a means of impeaching his own witness; and upon objection being duly made thereto, the court sustained the objection and prohibited the testimony. Even assuming that the guarantees of trustworthiness were met and that the words spoken by Miss Churchill immediately after the accident were admissible as a part of the defendant's case, there could be no error in refusing the admission of such testimony when the attorney did not offer it as a part of his main case but solely offered it for the purpose of impeaching the witness he had called.

I agree with the majority opinion in holding that there was a jury question involved and that the evidence did not disclose such negligence on the part of the plaintiff as would prevent her recovery. However, I do not believe that there was any error committed by the trial judge as set forth in the prevailing opinion, and I think the judgment should be affirmed.

PRATT, J., on leave of absence.