STATE of Iowa, Appellee,

v.

Charles Walter GILMORE, Appellant.

No. 60095.

Supreme Court of Iowa.

Nov. 23, 1977.

Gerald T. Sullivan, Cedar Rapids, for appellant.

Richard C. Turner, Atty. Gen., J. Susan Carney, Asst. Atty. Gen., Eugene J. Kopecky, County Atty., for appellee.

Heard before MOORE, C. J., and MASON, LeGRAND, REYNOLDSON and HARRIS, JJ.

MASON, Justice.

Defendant, Charles Walter Gilmore, appeals from judgment imposing sentence on his conviction by a jury of the crime of manslaughter. Gilmore had been charged by county attorney's information with the murder of Howard Cook in Linn County August 14, 1976. He admitted he had shot and killed Cook but maintained it was in self-defense.

Before trial defendant had filed a motion to suppress all statements made by him to the Cedar Rapids police. Following an evidentiary hearing the trial court suppressed all statements following the phrase, "I don't want to talk about it any more." All statements preceding that phrase were admissible.

Defendant urges two grounds as a basis for reversal of his conviction. He contends the police did not adequately explain to him his constitutional rights under Amendments 5 and 6 as mandated in *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (hereinafter constitutional rights) and he did not understand the reading of the waiver of rights he signed because his reading achievement only reaches the third grade level. After considering expert opinion as to defendant's reading level, the trial court concluded defendant knowingly, willfully and voluntarily waived his rights and the court then allowed the playing to the jury of a taped interview containing inculpatory remarks of defendant.

Defendant also contends the trial court erred in admitting the prior statement of a State's witness, Mary Jo Blackcloud. The statement was admitted at the State's request for impeachment of the State's own witness but was later withdrawn from the jury's consideration by the trial court.

Defendant was arrested by Cedar Rapids policemen McLeod and Sliger in the early morning of August 14. At 3:49 a.m. while they were on the way to the police station, Officer McLeod read defendant his constitutional rights and asked him if he understood and if he would like to talk. Defendant talked to him and admitted he had shot

Cook. At trial defendant stated he had not heard the rights read to him.

Upon their arrival at the police station, the officers turned defendant over to Detectives Millsap and Rosdail. Millsap gave an oral statement of defendant's constitutional rights to him but left out the fact anything defendant said could and would be used against him. Millsap then had defendant read aloud a standard rights waiver which was used by the Cedar Rapids Police Department. There is some dispute in the record as to whether defendant omitted some portions of the warning while reading it aloud. In any event, after ascertaining to their satisfaction defendant understood the rights waiver which he signed, the detectives began their questioning.

Under questioning defendant made several inculpatory statements and several claims the killing had been in self defense. At some point in the questioning, defendant expressed his desire not to speak further with the detectives. They persuaded him to continue and upon culmination of the session, Millsap dictated a statement containing his summary of the discussion. This summary was read to defendant after it was typed and was subsequently signed by him.

Before trial defense counsel moved to suppress the entire interview. After the hearing on defendant's motion the trial court ruled in pertinent part as follows:

" * * *

" * * * The Court further finds that the State has established by a preponderance of the evidence that any oral statements made by the Defendant to Officers McLeod or Sliger following said arrest were either voluntary statements, not the result of in-custody interrogation, or were made following such time as Defendant was fully advised of his Fifth and Sixth Amendment rights and knowingly, willfully and understandingly waived such rights and agreed to talk to the officers.

"The Court further finds that the State has established by a preponderance of the evidence the following additional facts:

"(a) * * *

"(b) Considering all of the evidence produced, including the evidence pertaining to the ability of the Defendant to read and understand, the Court finds that the State has established by a preponderance of the evidence that prior to answering questions propounded by Detectives Millsap or Rosdail the Defendant had been fully advised of and knowingly, willfully, and voluntarily waived his Fifth and Sixth Amendment rights and agreed to answer the questions propounded to him by the Detectives. The evidence established that oral statements thereafter made in the presence of Detectives Millsap and Rosdail were voluntary until such time as (approximately three-fifths of the way through the tape-recorded interview) the Defendant stated 'I don't want to talk about it anymore.' The Court believes and finds that any statements made by the Defendant after the making of the quoted statement were not voluntary, and to admit same in evidence upon the trial of this case would be a violation of the Defendant's Fifth Amendment rights. The finding of involuntariness just made encompasses the written statement signed by the Defendant at the conclusion of the interview, * * *."

At trial the court allowed the playing of the entire portion of the tape not suppressed.

The second issue raised by defendant concerns the admission and subsequent withdrawal of part of the testimony of Mary Jo Blackcloud. Mary and her sister, Marilyn, were with Howard Cook when he was shot. Sometime after the shooting Mary was interviewed by Detectives Millsap and Rosdail who made a statement of her remarks which Mary signed.

At trial the State called Mary as its witness. Her testimony prior to the testimony in question here was in pertinent part as follows:

"Q. Okay. And what did you do when the tavern closed? A. We then drove to the—to this other house and I—

"Q. Who was it that drove over? A. Howard.

"Q. Okay. And who all went along? A. Howard, myself, and my sister Marilyn.

"Q. Okay. Was anybody else along? A. No.

"Q. Okay. And where was it that you drove to? A. To this house, Tenth Avenue and between Sixth and Seventh Street.

"Q. Okay. Would that be 617 Tenth Avenue, S.E.? A. I think so.

"Q. That's here in Cedar Rapids? A. Right.

"Q. Okay. Can you tell us what kind of place that is, what kind of establishment that is? A. It's an after-hours place.

"Q. Okay. What did you do after you got in—after you went in?

" * * *

"A. Well, after we had gotten our drinks, me and my sister sat down and he went into the other room to shoot some dice.

"Q. Okay. And what happened after that? A. Well, he was in there shooting dice for about a couple minutes. Then I went in there and we were just standing there. I was just watching them, and pretty soon this guy comes in—I don't know who he was—and Howard—well, this guy was staring at Howard, and then Howard asked him what he was staring at, and I don't know whether that guy said anything. So I then asked Howard to leave—for us to leave, so we left.

"Q. Okay. When you left, who all left together? A. Me, Howard, my sister, and somebody else. I don't know who it was.

"Q. Okay. What did you do as you walked out? A. Well, me and Howard had gone ahead of Marilyn and the other guy and went out the door and I saw—I can't remember—

"Q. Do you know who the man was that was staring at Howard? A. No.

"Q. Now, Mary Jo, do you remember anything that happened after you walked out of the house? A. Well, the next thing I remember—well, Howard was laying [sic]

on the ground and my sister came by and said then, of course, to go with the hospital with them.

"Q. Okay. Do you remember any shots being fired? A. No.

"Q. You don't remember anything that happened after you came out until Howard was lying on the ground? A. Right.

"Q. Could you tell us why you don't remember any of that happening? A. Because I was tired, plus I had quite a few drinks. It was just a lot of excitement, I guess.

"Q. Do you remember if Howard was carrying a gun when you—had a gun on him when you walked out the door? A. I don't know if he did or not.

"Q. Did you see what happened to the man who was staring at Howard when you left? A. No.

"Q. Did you see him leave? A. No.

"Q. Do you recall going down to the police department? A. Yes.

"Q. Do you recall giving a statement to a policeman on the night—or the morning that this happened? A. Yes.

"Q. Did you go to the hospital first? A. Yes."

At this point the court excused the jury and asked the prosecutors if they had something they wanted to bring up out of the presence of the jury. The prosecutor, Mr. Denton, answered:

"Yes, Your Honor. What we would propose to do—our copy of the statement that the witness signed—probably not our copy of the statement the witness signed, but, in any event, a copy of the deposition—what we would propose to do now is to ask the witness if she gave a statement on the night that this event occurred to Detectives Millsap and Rosdail, and she took the statement and she signed it. And it's my understanding that this witness would testify she has—she indicated a few minutes ago she didn't remember what happened. In the statement she gives a much more complete statement as to the facts that occurred, and we would propose to introduce the state-

ment and ask her to identify it and ask her if she made the statement and so forth."

The prosecution then explained it wished to use the statement to impeach its own witness. There followed a lengthy discussion in which the defense attorneys interposed many objections to the introduction of the statement. They objected it was improper to impeach one's own witness. They argued the statement did not become admissible just because the witness had previously given it and now at trial she does not remember the underlying facts. Counsel further objected because it was an attempt to get into evidence indirectly that which the prosecution could not get indirectly.

At one point the defense stated: "I would point out that this witness is not saying that she didn't give a statement, and something else was said which she is saying she doesn't remember, which is not—that fact is not subject to impeachment. The fact she doesn't remember that—what has to be impeached? * * * The only impeachment we could have in this case is impeachment whether she does or doesn't remember."

The prosecution then attempted to lay a foundation for the admission of the evidence on the basis of past recollection recorded. After appropriate objection by defense attorneys the court ruled the prosecution had not laid a proper foundation under that theory. The prosecution then returned to its impeachment argument.

The defense later objected as follows:

"MR. SULLIVAN: It seems to me what the Court is saying, they are going to allow the prosecution to do indirectly what they can't do directly. I think the only way that he can refer to a past statement—out-of-court statement—supposedly made by this witness if this witness testifies to something different on the stand, and I still think that this witness has not testified to anything different. She has just said I don't remember. And unless they can impeach the fact 'I don't remember'—that's not true, then I don't think it's proper

impeachment even to partially go into the thing, because she is just going to be able to read portions of the statement. It's going to leave the impression in the mind of the jury that's what she said on the night in question. For some reason she is not saying that now. It's not proper impeachment.

"In fact, this witness had denied on direct examination that she saw—not the fact of whether it was recorded or written down correctly, but if she said, 'No. Howard didn't have his gun,' after the statements said 'Howard did have his gun.' I think the proper impeachment would be 'Didn't you make the statement to the police at such and such a time where you said, "He did have a gun"?' Then that would be proper impeachment. But she has not said anything in her direct testimony so far that's impeachable or can be approached in this way."

The court concluded the prosecution should be allowed to read pertinent parts of Miss Blackcloud's statement to her. in the presence of the jury for impeachment purposes. Pursuant to an agreement between defense and prosecution, objections raised to the testimony made during the lengthy discussion out of the presence of the jury were not interposed during the ensuing testimony but were preserved in the record of the discussion. The testimony objected to by defense counsel but admitted by the court was as follows:

"Q. Now, Miss Blackcloud, did you go down to the police station after you went to the hospital? A. Yes.

"Q. Okay. Now, Miss Blackcloud, do you remember making a statement to the police officers down there at the police station? A. I remember going down there, yes.

"Q. Okay. You remember signing a statement? A. Yes.

"Q. Okay. Now you say you don't remember right now—you can't tell us what happened on August 14 after you and Howard and Marilyn walked out of the door of Cleo Luter's place, is that right? A. Right.

"Q. Do you recall making the statement that 'the black subject who had been staring at Howard followed us out. When we got out on the porch, Howard and the black subject again had words, and I was attempting to get Howard to leave when the black subject walked into the street and then yelled something back at Howard about shooting him. Howard had made some remarks and the black subject yelled back, "Yeah, I'll shoot you." And I noticed the black subject then had a gun in his hand and he started shooting at Howard.' Do you remember making that statement? A. No.

"Q. Do you remember making the statement that 'my sister Marilyn ran off and Howard was hit and fell. When he fell, I noticed Howard pulling his gun out of his right front pocket, however, do not believe he was able to fire. My sister ran over to the guy that was shooting and yelled at him, "Stop shooting, that is my sister." I got down and tried to help Howard.' Do you remember any of that? A. No."

The trial court later determined it had been incorrect in its ruling admitting the statement. The next day it repeated the questions and answers at issue and specifically admonished the jury to disregard the questions and answers and to give no consideration whatsoever to whether Miss Blackcloud did or did not make any statements to the police about any aspects of the offense which was the subject of the trial.

No objection was made as to the form of the admonition at the time it was given or immediately thereafter. At a later point in the trial, objection was made during a discussion out of hearing of the jury.

Prior to its admonition to the jury the court asked Mr. Gutz, one of the defense attorneys, if he would consent to the giving of an admonition to the jury to disregard the objectionable statements. As the incident was perceived by the court, it remembered Mr. Gutz agreeing to the making of the admonition but stating he wished to have an opportunity to make a record that the admonition was insufficient to cure the situation.

Mr. Gutz agreed with the court's recollection of the event and explained he did not discuss the incident with Mr. Sullivan, the other defense attorney, because he did not realize the court was going to reread all the objectionable testimony in its admonition. The court had not advised Mr. Gutz as to the form of its admonition prior to its elicitation of consent from Mr. Gutz to the giving of an admonition.

At this later discussion Mr. Sullivan made the following objection to the admonition:

" * * * I'm very much—strongly object to the Court admonishing the jury and doing nothing more than repeating exactly the testimony we are supposed to be getting out. I couldn't get up and interrupt the Court when it was doing it. All we ended up doing was telling the jury a second time exactly the evidence which we are supposed to be trying to keep out of their mind. I would have been in favor, if there was going to be an admonition, that the admonition be in a general sense, for them to disregard it, not repeating the exact words.

"Now, we are in a position—and I intend to in my final argument talk about their attempt to impeach this witness by reading from a statement just to attack the credibility of that witness and the credibility of the whole Government's case."

At the end of this discussion the court stated:

"I guess I'll have to take my chances on the form of the admonition. You didn't waive any error as to the form. This was simply—I did give you a choice as to no admonishment at all or an admonition."

The form of admonition was never urged by defendant as a basis for mistrial during the trial proceedings. Nor was the issue as to the form of the admonition ever asserted in defendant's motion for a directed verdict made at the close of the State's evidence and renewed at the close of all evidence. There were no post-trial motions. This issue is now raised on appeal on the strength of the objections raised by Mr. Sullivan.

I. The question at this point is whether the objections alone were sufficient to preserve this issue for review on appeal.

■ A party who maintains the prejudicial effect of a trial court's erroneous ruling on a challenge to the admission of evidence in a jury trial cannot be cured by an admonition to the jury must ordinarily move for a mistrial as soon as the grounds therefore first become apparent in order to preserve the question for review on appeal. See in support *State v. Ware*, 205 N.W.2d 700, 702 (Iowa 1973).

■ However, in our opinion, the record here presents an extraordinary situation. The trial court made clear to defense counsel, Mr. Gutz, it had determined its admonition to the jury was sufficient to remove any prejudice created by admission of Miss Blackcloud's statements. Mr. Gutz stated to the court that such a determination by the court was its own to make and he would not object to an admonition on the record. He did, however, object and reserve a right to make a record that no admonition to the jury was sufficient to erase the prejudicial effect.

When the court stated it would have to take its chances on the form of the admonition, it had, in effect, decided the form was correct. The only possible purpose of a motion for mistrial here would have been to alert the court and opposing counsel to error in the form of the admonition. We conclude this was accomplished, and consequently the matter is preserved for our review on the strength of Mr. Sullivan's objections.

II. We now consider whether a party may impeach his own witness by proof of the witness' prior statement when the witness claims not to remember the underlying facts described in the statement.

■ There can be no doubt the State had the right to impeach its own witness. In *State v. Trost*, 244 N.W.2d 556, 559–560 (Iowa 1976), this court adopted rule 607, Uniform Rules of Evidence, which allows impeachment of one's own witness and announced: " * * * Henceforth, in all trials in this state, the credibility of a witness

may be attacked by any party, including the party calling him."

The problem arises from the method employed by the State in seeking to impeach Mary Jo Blackcloud, its own witness, when she did not recall the underlying facts that occurred on the night of the shooting and which she had detailed in her statement to the police. Although Miss Blackcloud admitted making a statement to the police she denied remembering anything that happened after she came out of the house until Howard Cook was lying on the ground.

Defendant maintains the prejudicial effect of the introduction and admission in evidence of Miss Blackcloud's prior statement to the police was not cured by the trial court's later admonition to the jury to disregard totally the questions and answers directed to the prior statement of Miss Blackcloud.

The State, on the other hand, argues that even if it were error to allow it to impeach its own witness in the manner previously described such error did not reach prejudicial proportions justifying reversal. It argues the court's admonition to the jury avoided the prejudicial effect and the evidence admitted was merely cumulative of that to which other witnesses testified without objection.

Our task is to determine whether the statement given to the police was admissible as a prior inconsistent statement under the record presented here.

■■ The first test in determining if such a statement, written or oral, is admissible is whether a proper foundation has been laid for its admission. The laying of a proper foundation is necessary as a warning to the witness. The witness is warned the statement is going to be used so that he can prepare to prove he did not make it or so that he can prepare to explain it away if he admits he made it. The use of a proper foundation is a prerequisite in most jurisdictions to the use of the statement. 3A, Wigmore on Evidence, (Chadbourn Rev.), section 1028, pp. 1023–1029. However, the foundation requirements to prior inconsistent statements do not apply to admissions of a party-opponent. *State v. Hephner,* 161 N.W.2d 714, 720 (Iowa 1968). See also Rule 613, Uniform Rules of Evidence, 1974, and Fed. Rules Evid. Rule 613(b).

■■ It is usually necessary for the questioner to ask foundation questions which specify some details as to the occasion of the remarks or written statement. This warning was given in the instant case and thus this test was met.

The second test is whether the statement goes to a question at issue in the case, or to discrediting the witness or whether it is collateral thereto. As explained by Wigmore the true test as to collateralness is the test laid down in *Attorney General v. Hitchcock,* 1 Exch. 91, 99 (1847): " * * * *Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?"* (Emphasis in original). Wigmore, section 1003, at p. 961.

In explanation of this test, Wigmore offers the following:

"In applying the test of *Attorney General v. Hitchcock,* it is obvious that there are two different groups of facts of which evidence would have been admissible independently of contradiction: (1) facts relevant to some issue in the case, and (2) facts relevant to the discrediting of a witness.

"(1) *Facts relevant to some issue in the case.* The test in question usually causes here no difficulty in its application; the issues in the case indicate what facts would be relevant:

" * * *

"(2) *Facts discrediting the witness in respect to bias, corruption, skill, knowledge, etc.* Since, by the rule in *Attorney General v. Hitchcock,* any fact which would be independently admissible may be made the subject of a contradiction, a second class of facts includes those which could *otherwise be receivable for the purpose of impeaching some specific testimonial quality.*" (Emphasis in original). Wigmore, sections 1004–1005, pp. 965–966.

The statement here offered into evidence went directly to an issue in the case, self-defense. It therefore met the second test.

The third test concerns the use to which the statement is to be put. "It is widely, but not universally, maintained by the courts that prior self-contradictions are not to be treated as having any *substantive* or *independent testimonial value*." Wigmore, section 1018, pp. 996–998. (Emphasis in original).

The foregoing statement from Wigmore concerns a question that is currently the subject of great controversy. For a full discussion of the question see *Beavers v. State,* 492 P.2d 88, 92–94 (Alaska 1971). See also *California v. Green,* 399 U.S. 149, 163, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489, 499, and *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222.

Immediately preceding the last above quote from Wigmore there appears this statement:

"* * * It follows, therefore, that the use of prior self-contradictions to discredit is not obnoxious to the hearsay rule.

"(b) It does not follow, however, that prior self-contradictions, when admitted, are to be treated as having no *affirmative testimonial* value, and that any such credit is to be strictly denied them in the mind of the tribunal. The only ground for doing so would be the hearsay rule. But the theory of the hearsay rule is that an extrajudicial statement is rejected because it was made out of court by an absent person not subject to cross-examination (§ 1362 *infra*). Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former statement. The whole purpose of the hearsay rule has been already satisfied. Hence there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve. Psychologically of course, the one statement is as useful to consider as the other; and everyday experience outside of courtrooms is in accord." (Emphasis in original).

In the case presently before us the earlier statement given by Miss Blackcloud to the police was being offered for the sole purpose of impeaching her as a witness. This prior statement was not being offered to prove the truth of the matter asserted in the statement. Hence, the controversial subject discussed in *Beavers* need not be reached in this case.

We conclude the statement given by Miss Blackcloud could be admissible as a prior inconsistent statement under a proper factual record.

III. Defendant maintains the factual situation presented by the record here is not one which would permit the use of the prior statement for impeaching Miss Blackcloud's testimony at trial.

We turn to defendant's argument in support of this position. Defendant contends the prior statement was inadmissible because the fact to be impeached was whether Miss Blackcloud remembered making the statement to the police. Defendant maintains the ultimate end of any questioning of Miss Blackcloud once she stated she did not remember the details of the events would be, at best, her admission she remembered the events described in the statement and, at worst, her adherence to her claim she could not remember those events.

Defendant argues that at no point could the prosecution have gained a proper admission of the statement into evidence. Defendant's argument is partially incorrect; there are circumstances in which a witness' testimony he cannot remember may properly be contradicted by his prior inconsistent statement.

In support of his position, defendant cites this court to McCormick on Evidence, (Second Ed.), section 36, p. 71, where it is stated:

"A distinct but somewhat cognate notion is the view that if a party interrogates a witness about a fact which would be favorable to the examiner if true, and receives a reply which is merely negative in its effect on examiner's case, the examiner may not by extrinsic evidence prove that the first

witness had earlier stated that the fact was true as desired by the inquirer. An affirmative answer would have been material and subject to be impeached by an inconsistent statement, but a negative answer is not damaging to the examiner, but merely disappointing, and may not be thus impeached. * * *."

This statement is not applicable here because Miss Blackcloud's testimony did not elicit either a negative or affirmative answer. Her lack of memory cannot be interpreted as either. There is considerable law that goes to the proposition that a witness can be impeached by a prior inconsistent statement when. he answers, "I don't remember," or is otherwise evasive. An examination of some of the cases will serve to illustrate our point.

In *Blackford v. Kaplan,* 135 Ohio St. 268, 20 N.E.2d 522, 525, we find the following pertinent comments:

"Defendant also contends that the trial court erred in not permitting the use of the deposition testimony of Pauline Hanna and Christine Hanna. The court ruled that the credibility of a witness can not be impeached by showing a contradictory statement when the witness answers a question, 'I don't know,' 'I don't remember' or 'I don't believe so.' In this ruling the trial court committed prejudicial error. The trial court may properly exclude impeaching evidence of this character when the witness sought to be impeached admits making the statements attributed to him; otherwise not."

In *Lawson v. State,* 36 Ala.App. 438, 57 So.2d 643, 644, there is the following pronouncement:

"On cross-examination this entire statement [one made to police officers after the homicide with which the witness' brother was charged] was read to L.C. He admitted signing it, but he stated that he did not remember relating to the officers the facts set out in the written document.

" * * *

"We come, therefore, to consider the purpose and purport of the written statement in the factual proceedings.

"It is permissible and proper to attack the credibility of a witness by showing that at a previous time and place he made a statement which was out of accord with the testimony he gave at the instant trial.

"It may be noted that, before this prior contradictory character of evidence is admissible, the witness involved must either deny he made the previous statement or. testify that he does not remember making it. * * * [citing authorities]."

In *Schwam v. Reece,* 213 Ark. 431, 210 S.W.2d 903, 908, the court (citing *Humpolak v. State,* 175 Ark. 786, 300 S.W. 426, 428), made the following pertinent remark:

" * * * 'But the great weight of authority is to the effect that a witness may be impeached by proof of prior contradictory statements, where he merely testified that he does not remember, or has no recollection of, making the statements referred to. Of course if the witness admitted that he made the contradictory statements there is no necessity for proving them and they are, therefore, not admissible in evidence.' * * *."

In *Reams' Administrator v. Greer,* 314 S.W.2d 511, 513 (Ky.1957), this statement appears:

" * * * The appellant contends that, since. Wood did not specifically deny making the statement, it could not be shown that he had. Where a witness has said he does not remember making a statement, he may be impeached by proof of prior contradictory statements. * * * [citing authorities]."

In *People v. Preston,* 341 Ill. 407, 173 N.E. 383, 388, 77 A.L.R. 631, reh. den., there appears this statement in the case which is factually similar to the instant case:

"Defendant on direct examination testified that he had no idea when he left Hansen's and did not know where he went when he left there, that the next thing he knew after that was finding himself on the freight train on the outskirts of West Chicago. During the cross-examination of the defendant, he was asked questions regarding his statements alleged to have been

made to the coroner on October 13 and 14. * * * He did not deny that the questions were asked him and that he made answer as indicated by the state's attorney in his interrogatories, but in each instance his answers were evasive, such as, 'Not to my knowledge,' 'I don't remember,' 'I can't say as I remember.' Where a witness, when asked as to the making of statements inconsistent or at variance with his testimony, neither directly admits nor denies the making of such statements, but states he does not know or recollect, or gives any other answer not amounting to an admission, it is competent to prove the affirmative by way of impeachment. * * * [citing authorities]."

For other cases which adhere to the same proposition as those previously cited see the following: *State Farm Mutual Automobile Ins. Co. v. Newell,* 270 Ala. 550, 120 So.2d 390, 396; *Trickel v. Rainbo Baking Company of Phoenix,* 100 Ariz. 222, 412 P.2d 852, 854; *People v. Roach,* 148 Cal.App.2d 364, 306 P.2d 523, 526; *Diebold v. People,* 175 Colo. 96, 485 P.2d 900, 902; *Wingate v. New Deal Cab Company,* 217 So.2d 612, 614 (Fla. Dist.Ct.App.1969); *Reilly Tar & Chemical Corp. v. Lewis,* 326 Ill.App. 84, 61 N.E.2d 290, 293; *People v. Saunders,* 132 Ill.App.2d 421, 270 N.E.2d 217, 220, 50 A.L.R.3d 1; *Jenkins v. State,* 14 Md.App. 1, 285 A.2d 667, 670–671; *People v. Graves,* 15 Mich. App. 244, 166 N.W.2d 480, 481–482; *Koop v. Great Northern Ry. Co.,* 224 Minn. 286, 28 N.W.2d 687, 690–691; *Ingram v. State,* 87 Okl.Cr. 223, 196 P.2d 534, 539; *State v. Nortin,* 170 Or. 296, 133 P.2d 252, 258–259; *Ashton v. Higgins,* 80 R.I. 350, 96 A.2d 632, 636; *Yellow Bus Line, Inc. v. Brenner,* 31 Tenn.App. 209, 213 S.W.2d 626, 630–631; *Hutson v. State,* 164 Tex.Cr.R. 24, 296 S.W.2d 245, 249 (See opinion on rehearing); *Morton v. Hood,* 105 Utah 484, 143 P.2d 434, 437–438; *Keatts v. Shelton,* 191 Va. 758, 63 S.E.2d 10, 13; *Spence v. Browning Motor Freight Lines,* 138 W.Va. 748, 77 S.E.2d 806, 811; *Heddles v. Chicago & N.W. Ry. Co.,* 77 Wis. 228, 46 N.W. 115, 117; *United States v. Alper,* 156 F.2d 222, 225 (2 Cir. 1946); *Williamson v. United States,* 310 F.2d 192, 198–199 (9 Cir. 1962).

Three Iowa cases have been found which support the proposition adhered to in the previously cited cases. In the first, *State v. Tharp,* 258 Iowa 224, 235–236, 138 N.W.2d 78, 85, there is this statement:

"Evidence of prior statements inconsistent with those made by a witness at the trial on a material matter may, of course, be introduced for the purpose of impeachment. * * * [citing authority].

"From the record we learn Lela Hanlin was called by the State on rebuttal and was allowed to testify, over defendant's objections, that she had heard the appellant's mother, Mary Barta, say: ' "Monte's mad at Larry because he's treating me so mean. The next time Larry lays a hand on me, Monte said he would kill him." ' Defendant was not present at the time of the conversation.

"Mrs. Barta, testifying for the defense, had previously asserted, in answer to a question on cross-examination, that she could not remember making any statement to Mrs. Hanlin that her son had threatened to kill Salter, and in effect denied it, saying; 'A statement like that? That's never crossed my mind. * * *.'

" * * *

"However, since the jury was not allowed to consider this testimony as substantive evidence, but as impeachment evidence only, we cannot say its admission as such was so improper as to directly prevent a fair trial and require the granting of a new trial."

In *State v. Galloway,* 187 N.W.2d 725 (Iowa 1971), this court upheld a conviction where a witness on cross-examination was asked questions by defense counsel about her testimony in the first trial of the defendant. The witness could not remember everything to which she had testified but would not deny she had made the statements attributed to her. On redirect the prosecution was allowed to read, over defense counsel's objections, the previous testimony of the witness. This court found no error in the trial court's admission of such evidence.

In *State v. Reynolds,* 250 N.W.2d 434, 440 (Iowa 1977), the court said:

" * * * On the witness stand Allen identified the defendant and described in detail one of the confederates, *but could not describe the other and was unable to name them.* He did however recall identifying them from the photographs he had seen earlier. The prosecutor then asked him if he had identified Jerry Jean Bainter and Robert Larry Anderson previously from photographs, and he answered in the affirmative.

"Counsel for the defendant interposed an objection that the question was leading and a blatant attempt to impeach the State's own witness, which objection was overruled. * * *

"The prosecutor used the prior identification made by the witness Allen to refresh his memory after Allen was unable to recall the names of the two men in his station. Prior statements may be repeated to jog the memory of a witness who surprises a party on the stand with his unexpected response. * * * [citing authority]. Prior statements may be used to impeach a witness as well as to refresh his memory. A party confronted with an unexpected answer will either try to rehabilitate the witness by eliciting an explanation for the different statements or *may attempt to neutralize the testimony by introduction of a prior inconsistent statement.* The trial court properly overruled the defendant's objection to the use of the prior statement of the witness Allen. * * * [citing authority]." (Emphasis supplied).

While it is apparent many other states have allowed impeachment of a witness by his prior statements where he does not remember or is evasive in his answers, it is equally clear we have not explicitly done so in Iowa. However, the three Iowa cases cited certainly approached such a holding.

Such a rule would be of great value in this jurisdiction. Without it a witness whose bias, prejudice, corruption, etc., is not apparent on direct or cross-examination can give facts only favorable to the defense (or defendant) or prosecution (or plaintiff) and totally avoid confrontation by his prior statement favorable to the other side. Without such a rule outside pressures could convince the witness that it would be to his advantage to conveniently forget the facts and, thus, the truth would be lost. With such a rule justice will be served where it might otherwise be thwarted.

■ In light of defendant's contention we deem it advisable to express our view that the proper rule to be followed where a witness makes a testimonial statement and then does not remember a prior inconsistent statement he made dealing with the same facts or is evasive as to that statement would permit either party to introduce the prior inconsistent statement into evidence if it meets the other tests previously set out herein. Its admission is subject to the laying of a proper foundation. It is not admissible unless it meets this test of collateralness: *"Could the fact, as to which the prior self-contradiction is predicated, have been shown in evidence for any purpose independently of the self-contradiction?"* (Emphasis in original). Wigmore, section 1020, p. 1010.

■ Here there was no testimonial statement with which Miss Blackcloud's prior statement to the police regarding Howard Cook's possession of a gun could be inconsistent. Miss Blackcloud did not remember the underlying facts dealing with the issue of self-defense which were the subject of her prior statement. Defense's arguments as to the inadmissibility of the prior statement are meritorious.

As previously noted, the defense argued the fact to be impeached was whether or not Miss Blackcloud remembered the facts contained in the statement. The only avenue of attack on the witness' credibility in this situation was on her memory or ability to recollect. The State was free to try to make her admit she remembered the underlying facts bearing on the issue of self-defense but was not free to read into evidence the prior statement. This point is discussed by Wigmore, section 1037, pp. 1042–1043, as follows:

"A notion that for a time obtained with some English judges, before the principle of self-contradiction was thoroughly differentiated, and a notion not uncommon today at our bar, is that a witness' *answer to the preliminary question* is the *testimonial statement* against which the impeaching contradictory statement is to be set off as inconsistent. Two fallacies, now generally discredited by the courts, have cropped out as the result of this underlying notion.

"One fallacy is that if the witness, when asked whether he did not say such-and-such a thing to the contrary, professes failure to remember or evades the question, then the contrary statement cannot be offered, because there is no assertion to contradict. In truth, however, his answer to the preliminary question is wholly immaterial. He had already made on the stand an assertion A; we wish to know that he has elsewhere made the opposite assertion A'; and, before introducing the latter we must ask him whether he made it; this preliminary question is simply to give warning and lay the foundation required by the rule; the contradiction already exists (if at all) between the assertions A and A'; and thus his answer to the preliminary question is of no consequence as forming a contradiction. It is the question alone that is essential; if the warning has been given, that is all the law is concerned with: * * *." (Emphasis in original).

In this case there was no assertion A with which statement A' could be found inconsistent. Miss Blackcloud did not make a testimonial statement as to the events described in her prior statement bearing on the question of self-defense. She did not remember the facts necessary to make statement A. She admitted making statement A'. If she had been asked if Howard had pulled out his gun while lying on the ground and had answered, "No," the answer "No" would have been a testimonial statement with which her prior statement could have been found inconsistent and thus admissible.

We conclude the record before us fails to present a situation which would permit the use of Miss Blackcloud's prior statement to the police for the purpose of impeaching her. As acknowledged by the trial court, it was error to admit the statement for this purpose.

■ IV. The question then becomes whether the admonition given by the trial court cured the error. We agree with defendant's argument that it did not.

■ V. However, error requiring reversal may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. Rule 103(a), Uniform Rules of Evidence, 1974, and Fed. Rules Evid. Rule 103(a). This court has announced that the erroneous admission of evidence that may be justification for reversal is not prejudicial where substantially the same evidence is in the record without objection. See *State v. Jurgenson*, 225 N.W.2d 310, 312 (Iowa 1975), and authorities cited.

With the foregoing rule in mind we turn to the facts narrated earlier in this opinion and to those appearing in the record.

It will be recalled the first statement Miss Blackcloud was asked was as follows:

"Do you recall making the statement that 'the black subject who had been staring at Howard followed us out. When we got out on the porch, Howard and the black subject again had words, and I was attempting to get Howard to leave when the black subject walked into the street and then yelled something back at Howard about shooting him. Howard had made some remarks and the black subject yelled back, "Yeah, I'll shoot you." And I noticed the black subject then had a gun in his hand and he started shooting at Howard.' Do you remember making that statement?"

In defendant's testimony we find almost all these facts repeated. He testified he was looking at Howard in the house. He admitted words passed between them. He admitted he had a gun in his hand and he fired first. This testimony was admitted without objection to its content.

The second statement Miss Blackcloud was asked was as follows:

"Do you remember making the statement that 'my sister Marilyn ran off and Howard was hit and fell. When he fell, I noticed Howard pulling his gun out of his right front pocket, however, do not believe he was able to fire. My sister ran over to the guy that was shooting and yelled at him, "Stop shooting, that is my sister." I got down and tried to help Howard.' Do you remember any of that?"

The testimony of Harvey Cook, Howard's brother, established the fact Howard pulled his gun after he was lying on the ground. Marilyn Blackcloud testified she ran up to the man shooting and told him to stop shooting because her little sister was there with Howard. This testimony too was received without objection to its content.

In light of this record we conclude the substantial rights of defendant were not affected by the erroneous admission and use of Miss Blackcloud's prior statement.

▆ VI. Defendant contends the trial court erred in admitting any part of the defendant's interview with the police. As has been previously noted, a part of that interview was suppressed because the trial court found it to be involuntarily given. Defendant insists the remainder should have been suppressed because defendant did not understand his rights since he could not read understandingly the waiver of rights statement he signed.

As noted, defendant called an expert witness to testify at the suppression hearing. Her conclusion, arrived at after several hours of testing, was that defendant could not understand the waiver of rights statement whether it was read to him or he read it aloud himself. It was established on cross-examination she had not tested defendant for his comprehension of the particular words in the waiver of rights form used by the police. It was further established defendant could be reading at a higher level even though his tests revealed his reading to be at the third grade level.

We must point out no testimony at the suppression hearing was directed to defendant's Intelligence Quotient (I.Q.). There

was no showing defendant was below normal in intelligence. Defendant's expert witness offered no opinion as to the reason for defendant's low reading level. She offered no evidence poor reading is linked to subnormal intelligence. There was no evidence defendant was incapable of replying he could not understand the waiver of rights statement read by him.

Even assuming defendant was below normal in intelligence it was still quite possible for the court to have found his statements to have been made voluntarily. As we stated in *State v. Fetters*, 202 N.W.2d 84, 89 (Iowa 1972):

"The general rule as to the effect of the mental deficiency of one confessing to a crime on the voluntariness or admissibility of his confession is stated in an annotation in 69 A.L.R.2d 348, 350, as follows:

" 'The law on the question * * * is relatively clear and may be summarized as follows: mental subnormality on the part of one confessing to a crime does not of itself deprive the confession of voluntariness or bar its admission in evidence so long as the subnormality has not deprived the person in question of the capacity to understand the meaning and effect of the confession. But mental subnormality is a factor to be considered in determining the issues of voluntariness and admissibility, and, where accompanied by other factors indicative of an absence of voluntariness, will require that the confession be excluded.

" ' * * *

" 'There is general agreement among the courts that a confession of crime is not inadmissible merely because the accused, who was not insane, was of less than normal intelligence.' "

In *Fetters* there was a showing of both a reading problem and subnormal intelligence but the court found after considering those factors the defendant's confession was voluntary and therefore admissible. Even though we find defendant here was shown to have a reading problem, there were other factors upon which the trial court could properly have based its finding of voluntariness.

 Defendant appears to be urging that the trial court had no choice but to suppress the statement once the expert witness opined defendant could not understand the waiver of rights statement. " * * * The trier of fact is not obliged to accept opinion evidence, even from experts, as conclusive. It may be accepted in whole, in part, or not at all. * * * [citing authority]." *State v. Shultz*, 231 N.W.2d 585, 587 (Iowa 1975).

In the present case, the trial court, as explained in its ruling denying defendant's motion to suppress, gave consideration to the expert's opinion but was not persuaded by it in reaching its decision the statements of defendant were voluntarily given. The trial court committed no error in this respect.

Defendant next contends the statements were not admissible because the trial court found the last part of the statement involuntary. Defendant cites us to *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, as his support for his proposition. He also points out as interesting the fact *Miranda* discussed the same interrogation techniques allegedly used by Detectives Millsap and Rosdail.

As stated, the testimony which followed defendant's request that the questioning cease was found involuntary and as such was suppressed by the trial court. The testimony prior to that suppressed was found voluntary by the trial court and we earlier agreed with that determination. The finding of involuntariness of the later statements does not render the prior voluntary statements inadmissible.

This statement of law finds support in *State v. Hilpipre*, 242 N.W.2d 306, 310 (Iowa 1976). In the cited case we quoted with approval the following from *State v. Moon*, 183 N.W.2d 644, 649 (Iowa 1971):

" '[W]henever an in-custody accused *in any manner or at any time* invokes his right to counsel any questions thereafter asked * * * constitute a part of the *Miranda* proscribed interrogation process.' (emphasis supplied)."

The questions asked before the invocation by an accused of his right to counsel if otherwise voluntary are admissible unless excludable on some other grounds.

The fact the officers used the particular interrogation technique mentioned in *Miranda* is immaterial in light of the extent of our review in this situation. See *Rinehart v. State*, 234 N.W.2d 649, 658 (Iowa 1975).

We have reviewed the totality of the circumstances herein and conclude the trial court was correct in admitting the designated portion of defendant's statement.

The case is therefore—Affirmed.