# IN THE SUPREME COURT OF IOWA

No. 18–2197

Submitted November 17, 2020—Filed March 5, 2021

STATE OF IOWA,

Appellee,

vs.

DERRIS L. SWIFT,

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Henry W. Latham II, Judge.

The defendant appeals his convictions of attempt to commit murder, intimidation with a dangerous weapon, willful injury resulting in serious injury, and possession of marijuana. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

McDermott, J., delivered the opinion of the court, in which all justices joined. McDonald, J., filed a special concurrence in which Waterman, J., joined.

Martha J. Lucey, State Appellate Defender, Vidhya K. Reddy (argued), Assistant Appellate Defender, and Derris L. Swift, Clarinda, pro se.

Thomas J. Miller, Attorney General, Louis S. Sloven (argued), Assistant Attorney General, Michael J. Walton, County Attorney, and Julie A. Walton, Assistant County Attorney, for appellee.

**McDERMOTT, Justice.**

A jury convicted Derris Swift of attempted murder and related crimes. Swift's main attack on appeal concerns the State's calling of three witnesses—all of whom the State knew to be reluctant to testify—that the State impeached on the witness stand with prior inconsistent statements they'd made to the police incriminating him. Although the district court instructed the jury that it could consider these statements only for purposes of impeachment, Swift argues that this instruction was insufficient and that the State should not be allowed to get inadmissible evidence before the jury by calling reluctant witnesses and then using out-of-court statements—which otherwise would be inadmissible hearsay—to impeach him.

I.

Ashanti Dixon lived in an apartment on Heatherton Drive in Davenport with her mother, Ameshia, and brother, Eziah. A bit before noon on a Wednesday morning in January 2018, Ashanti and her boyfriend, Derris "Debo" Swift, along with Ashanti's five-year old daughter, arrived at the apartment together in a Dodge Durango. Ameshia, Eziah, and Eziah's girlfriend, Ityloneia Watson, were all in the apartment at the time. They heard Ashanti and Swift arguing outside. The argument was sufficiently heated that Eziah took it upon himself to go outside to remove Ashanti's daughter from where Ashanti and Swift were arguing.

Ashanti eventually entered the apartment through a back door. Swift knocked on the back door of the apartment and demanded the keys to the Durango. Ashanti then exited through the front door, got in the Durango, and started driving away. When Ameshia told Swift that Ashanti had left, Swift left on foot.

As Ashanti drove down Heatherton, someone approached on foot and opened fire. Hit and bleeding, Ashanti managed to steer the vehicle to a nearby gas station and alert a cashier, who immediately called the police.

Police were on the scene within minutes. They arrived to find a Durango riddled with bullet holes, its windows shot out, and its driver, Ashanti, bleeding out in the front seat from a gunshot wound to her arm. First responders rushed her to the hospital.

Police swept the area and spoke to witnesses. Several reported seeing the shooting and described the shooter. Another witness reported seeing a person with a description similar to the shooter's running through an adjacent wooded area. The police soon spotted someone sprinting through a muddy cornfield behind a row of apartments bordering the woods and apprehended him. The muddy cornfield runner was Derris Swift.

Swift offered varying explanations for what he'd been doing. He said he was on his way to Hubbard's Cupboard (a local store) to buy a pack of Swishers for the marijuana that police found in his pocket. He said he heard the gunshots and ran out into the cornfield to get away. He said he was going to a friend's house. Later he said he was coming from the friend's house. (He repeatedly refused to give the friend's name.) Then he said he was coming from the library. Later he said he was going to the library. (He couldn't produce a library card.) When asked why he took the route through the woods and the muddy cornfield (the cornfield being barren and dormant for the winter) instead of a more direct route, he said it was because he just wanted to walk around. The police then discovered that Swift was the shooting victim's boyfriend and that the two had been

in an argument shortly before the shooting. The police took him into custody.

Swift's physical appearance generally matched the witnesses' descriptions of the shooter, except Swift was wearing a red, hoodless pullover sweatshirt, not a black hoodie as the witnesses had described. The police suspected he'd hidden the hoodie—along with the firearm— sometime in the fourteen minutes between the time the shooting was reported and the time the police captured him. Police searched the publicly accessible areas in the vicinity but didn't find a black hoodie or gun.

Ashanti had called her mother, Ameshia, after she'd been shot but before the first responders had arrived. Ameshia's own conversation with the police shortly after the shooting was captured on a body-cam video. When asked what Ashanti said during the call, Ameshia said, "Debo shot me!" Ameshia reiterated: "She was crying hysterically and said, 'Debo shot me.'"

Ashanti survived but suffers continuing nerve damage in her arm. Five days after the shooting, her arm in a cast, Ashanti met with a detective for a formal interview at the police station. In the interview, Ashanti said, "I have no doubt in my mind it was probably Debo," and "I know the guy in front of my car was Derris."

The State charged Swift with intimidation with a dangerous weapon, Iowa Code section 708.6 (2018); willful injury resulting in serious injury, section 708.4; possession of marijuana, section 124.401(5); and attempted murder, section 707.11. A jury trial was scheduled for July 23, 2018.

Swift spoke with Ashanti on recorded calls while in jail awaiting trial. In these calls, Swift pressured Ashanti to assist him with his defense. In one call, Swift emphasized that he knew she "would do anything" for him

and told her he would be released from jail soon: "[T]hey ain't got no gun. They only got a witness that said I did that shit, but that shit ain't gonna hold up. Do you hear me?"

The State thereafter struggled to reach Ashanti and her family. On July 19, the State filed a motion to continue the trial stating that it appeared some witnesses were avoiding being served with a subpoena and that it wasn't clear if Ashanti would continue to cooperate with the prosecution. Trial was continued. It commenced on October 15, with the jury finding Swift guilty of all the charges. The district court denied Swift's motion in arrest of judgment and motion for new trial.

He appealed, claiming that the State violated the "*Turecek* rule" in calling several witnesses and admitting certain exhibits and that Swift's counsel was constitutionally ineffective for failing to raise proper objections and failing to request a more specific instruction on the use of impeachment evidence. We transferred the case to the court of appeals, which affirmed the convictions. Swift sought further review, which we granted.

II.

Swift argues the State committed a *Turecek* violation, in reference to our holding in *State v. Turecek*, by calling and impeaching Ashanti, Ameshia, and Watson. 456 N.W.2d 219, 225 (Iowa 1990). Iowa Rule of Evidence 5.607 permits a party to attack the credibility of its own witness. But in *Turecek*, we held the prosecution may not "place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible." 456 N.W.2d at 225. *See generally* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.607:1, at 576–78 (2017–2018 ed. 2017).

We observed in *Turecek* that the State's right to impeach its own witness under rule 5.607 "is to be used as a shield and not as a sword" and thus that parties may not use impeachment evidence "for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible." *Turecek*, 456 N.W.2d at 225 (quoting *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981) (per curiam)). Particularly in a criminal case, permitting impeachment with inadmissible hearsay risks the jury relying on the impeachment evidence for the truth of the matters asserted—as substantive evidence—and not as an attack on the witness's credibility or another permitted use of impeachment evidence. *See Turecek*, 456 N.W.2d at 224–25; *see also State v. Belken*, 633 N.W.2d 786, 794 (Iowa 2001).

Parties of course commonly confront situations in which a witness's testimony isn't completely helpful or completely damaging. In these situations, parties often elicit the helpful testimony as well as the damaging testimony and then impeach the witness on the damaging testimony. Calling a witness with a mix of expected testimony—some helpful, some damaging (and thus requiring impeachment)—does not create a *Turecek* violation because the primary purpose for calling the witness is not to place otherwise inadmissible evidence before the fact finder. Parties should not "be put to the choice between the Scylla of forgoing impeachment and the Charybdis of not calling at all a witness from whom it expects to elicit genuinely helpful evidence." *United States v. Webster*, 734 F.2d 1191, 1193 (7th Cir. 1984). Rather, all the evidence in these situations (helpful, damaging, and the impeachment of the damaging) is ordinarily relevant to the fact finder's determination and, so long as not inadmissible under another evidentiary or exclusionary rule, admissible for its purposes. 27 Charles Alan Wright & Victor James Gold,

*Federal Practice and Procedure: Evidence* § 6093, at 613–14 (2d ed. 2007). Of course, even when *Turecek* presents no barrier to calling a witness, rule 5.403 remains a safeguard to protect against particular questions or subjects that must be excluded when impeachment evidence presents sufficient danger of unfair prejudice, confusing the issues, or misleading the jury.

Swift argues that the State committed *Turecek* violations in calling to the stand Ashanti (the shooting victim), Ameshia (her mother), and Watson (her brother's girlfriend living at the apartment). But Swift raised no objection that would have given the district court any inkling he was contesting their testimony on *Turecek* grounds. Swift made no objection *before* the State called any of the three witnesses to the stand, which certainly would have been appropriate if he believed that the State knew any witness had recanted earlier statements and that the witness thus was being called for the primary purpose of injecting inadmissible hearsay through impeachment.

Nor did he make any objection *during* any witnesses' testimony suggesting any *Turecek* violation. During Watson's testimony, Swift's counsel objected to a single question, stating that the prosecutor was "trying to impeach her own witness." The prosecutor in response correctly noted that a party may impeach its own witness (see rule 5.607), and the district court overruled the objection. Swift's counsel made an identical objection during Ameshia's testimony, drawing an identical ruling. Swift raised no objection to any question during Ashanti's testimony (other than a single "asked and answered" objection). Swift's counsel thus never identified, at any time, any *Turecek* issue for the district court to address. As a result, Swift failed to preserve error on any *Turecek* claim for appeal.

Swift asks that, should we find his trial counsel failed to preserve a *Turecek* objection, we analyze whether the failure constituted ineffective assistance of counsel. Senate File 589 amended Iowa Code section 814.7 to disallow resolution of ineffective-assistance-of-counsel claims on direct appeal. 2019 Iowa Acts ch. 140, § 31 (codified at Iowa Code § 814.7 (2020)). But as Swift correctly recites, he appealed before the amendment took effect on July 1, 2019, so the amendment presents no barrier to our consideration of this issue. *Id.*; *State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019). To establish ineffective assistance of counsel, a defendant must show both (1) a breach of an essential duty and (2) prejudice based on a reasonable probability of a different result sufficient to undermine our confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984); *State v. Carrillo*, 597 N.W.2d 497, 499–500 (Iowa 1999) (per curiam).

But we can't find the State called a witness as a subterfuge to inject inadmissible hearsay through impeachment when there's no evidence that the State was aware it would need to impeach its witness at all. To be sure, the record establishes the State had difficulty communicating with Ashanti in advance of trial. (The record also establishes that Swift personally encouraged her not to cooperate in the prosecution.) But reluctance to testify isn't enough, and that's all Swift offers us. The record shows the prosecutor met with Ashanti and Ameshia during a lunch break right before they testified and reviewed evidence of their prior statements with them. In light of such a meeting, there's no reason for us to conclude the State should then expect either witness to deny making their prior statements or recanting them under penalty of perjury on the stand. When making the decision to call a witness, the State is not required to speculate that a reluctant witness will provide false testimony or testimony that will

differ from prior statements. *United States v. Patterson,* 23 F.3d 1239, 1245 (7th Cir. 1994). "In fact, quite the opposite is true; 'an attorney is entitled to assume that a witness will testify truthfully.'" *Id.* (quoting *United States v. Carter,* 973 F.2d 1509, 1513 (10th Cir. 1992), *cert. denied,* 507 U.S. 922 (1993)). There's nothing in the record indicating any of the three witnesses had previously alerted the State of an intention to divert from any prior statements, let alone recant them.

More importantly, all three witnesses had admissible, helpful testimony sufficient for the prosecution to call each of them to testify, even if Swift had lodged any *Turecek* objections. All three testified to Swift's presence in the area near the shooting in the moments before it happened, a critical fact considering Swift's defense centered on the contested issue of the shooter's identity. Ashanti testified about the extent and source of her injuries, which the State was obligated to prove. Ameshia testified to telling Swift that Ashanti had left the apartment and that Swift didn't leave until she told him this. And Watson provided foundation for admission of Ameshia's statements about Ashanti's postshooting phone call sparking "a whole bunch of emotions" in Ameshia (more on this below). When confronted with a witness providing both helpful and damaging testimony, *Turecek* doesn't forbid calling the witness to the stand. Swift thus fails to establish his trial counsel breached an essential duty necessary for an ineffective-assistance-of-counsel claim.

### III.

Swift argues that, even if we find no *Turecek* issues in play, the district court nonetheless erred in permitting alleged improper impeachment of Watson and in admitting three prior taped statements of Ashanti and Ameshia.

A.

Watson testified to being at the apartment during the argument between Ashanti and Swift prior to the shooting and recalled her boyfriend, Eziah (Ashanti's brother), going out to bring in Ashanti's child to remove the child from the situation. But on the stand she couldn't recall certain other events from that morning, including some she described to law enforcement shortly after the shooting.

The State attempted to refresh her recollection seemingly by reciting statements from a police report. For example, the prosecutor asked her, "Do you remember telling the police officer that Ashanti was trying to get her daughter inside the apartment?" Swift's counsel objected to the question as leading and added that the prosecutor should ask the witness what she recalled saying without putting words in her mouth. The district court sustained this objection. But later the prosecutor asked a series of questions with lead-ins such as, "do you recall telling the officer" and then making a statement the prosecutor suggested Watson had made. Watson answered that she recalled hardly any of the statements. But the hearsay that generally incriminated Swift was made clear. Swift's counsel lodged no objections to any of the questions, so error hasn't been preserved for appeal. Swift asks us to review them under an ineffective-assistance-of-counsel lens.

Because Watson testified that she didn't recall the events the prosecutor asked about, "the only subject to be impeached is the witness's memory or ability to recollect." *State v. Russell*, 893 N.W.2d 307, 317 (Iowa 2017). For an out-of-court statement to be admissible as impeachment, there must be a contradictory statement by the witness. *Brooks v. Holtz*, 661 N.W.2d 526, 531 (Iowa 2003). But based on the way the prosecutor phrased the questions, the prior inconsistent statements recited in the

questions appear not to have been used for impeachment to attack a contradictory statement by the witness but instead to refresh Watson's recollection. The prosecutor introduced the questions with phrases such as "do you remember saying" or "do you remember telling the officer." While we've said that prior out-of-court statements "may be repeated to jog the memory of a witness who surprises a party on the stand with [an] unexpected response," *State v. Reynolds*, 250 N.W.2d 434, 440 (Iowa 1977), that practice should be limited. When a witness denies having any recollection in answer to a question, there lurks a danger that reciting an inconsistent statement to refresh the witness's recollection will be given weight as substantive evidence. While the State is "free to try to make her admit she remembered the underlying facts bearing on the issue," it is "not free to read into evidence the prior statement." *State v. Gilmore*, 259 N.W.2d 846, 857 (Iowa 1977). The State thus wasn't permitted to read, seemingly verbatim, Watson's out-of-court statements from the police report under the guise of refreshing her recollection.

But regardless of whether Swift's counsel breached an essential duty in failing to object to these questions, any error is harmless on this challenge. The jury was instructed that questions from the attorneys were not evidence, and the prosecutor's manner of phrasing of these questions likely somewhat dampened their impact on the jury. More importantly, other witnesses generally testified to the same facts that Watson denied or couldn't remember. Ameshia's testimony, in particular, covered much of the same territory. Because the questions were cumulative of testimony from others, we find any error in counsel's failure to object was harmless. *See State v. Holmes*, 325 N.W.2d 114, 116 (Iowa 1982).

B.

Swift argues the district court abused its discretion in admitting into evidence Exhibit 85, a police body-cam video of a discussion with Ameshia immediately after the shooting. In the video, Ameshia states that Ashanti was crying hysterically and told her "Debo shot me." Swift argues the exhibit was improper impeachment under *Turecek* and was inadmissible.

As an initial matter, no *Turecek* violation occurs if evidence would have been admissible under a different evidentiary rule. *See State v. Russell*, 893 N.W.2d at 316. In *State v. Russell*, we held a prior out-of-court statement was admissible under Iowa Rule of Evidence 5.801(*d*)(1)(C) for identification purposes notwithstanding a claimed *Turecek* violation. 893 N.W.2d at 317–18.

The body-cam video is double hearsay, recording Ameshia's out-of-court statement in turn reciting Ashanti's out-of-court statement. Under Iowa Rule of Evidence 5.805, hearsay within hearsay is not excluded if each part meets a hearsay exception. *See Madison v. Colby*, 348 N.W.2d 202, 204 (Iowa 1984) (en banc). The rationale behind the excited-utterance exception "is that statements made under the stress of excitement are less likely to involve deception than if made upon reflection or deliberation." *State v. Harper*, 770 N.W.2d 316, 319 (Iowa 2009). Both Ashanti's and Ameshia's statements on the body-cam video meet the excited-utterance hearsay exception of Iowa Rule of Evidence 5.803(2) because, according to Ameshia, Ashanti made her statements after having just been shot and was crying hysterically when she said, "Debo shot me." And Ameshia made her statements to police shortly after learning her daughter had been ambushed and shot. Ameshia admitted she was "very distraught" and, according to Watson, was experiencing "a whole bunch of emotions." When a witness's out-of-court statement is admissible under

a hearsay exception—as with an excited utterance—there is no *Turecek* violation. *State v. Tompkins*, 859 N.W.2d 631, 639 (Iowa 2015).

And in any event, the statements were not hearsay because they were admissible impeachment evidence. They were not offered for the truth of the matter asserted but were necessary to counter testimony by both Ashanti and Ameshia. Ashanti, at one point, testified that she never told anyone that Swift shot her. That was false, and the video properly impeached her testimony on this subject. Likewise, Ameshia testified on the stand that Ashanti only said that "she got shot," not that "Debo shot me." When asked about her statement in the video, Ameshia testified she assumed it was Debo, but Ashanti didn't tell her that. The video impeached her testimony. The State properly showed the video to impeach testimony from both witnesses. The district court included a cautionary instruction that directed the jury to consider the evidence for impeachment purposes only. The district court didn't abuse its discretion in permitting the jury to see and hear the body-cam video.

## C.

Swift argues the district court abused its discretion in admitting into evidence Exhibit 87, a recorded call between Ashanti and a man named Calvin Davis. During the call, Ashanti implied that she believed that Swift had shot her. Swift argues that Ashanti admitted on the stand to making these statements to Davis, and thus, the recording should not have been introduced to impeach her. But Ashanti's admissions were halting at best and were at odds with the thrust of her testimony. In *State v. Ware,* we held it was proper to introduce the challenged out-of-court statement the witness attempted to explain away on the stand to let the jury hear the exact words for purposes of comparison with the in-court testimony. 338 N.W.2d 707, 712–13 (Iowa 1983). Opposing counsel may then address

any inconsistency. *Id.* Ashanti testified that she would have known if it had been Swift who shot her, and on that basis, she testified Swift was not the shooter. That's contradicted by her statements on the recording when she said, "Had he not shot me, he could've had me," and "Who the fuck tries to kill your girlfriend over some dumb shit?" The district court didn't abuse its discretion in permitting the jury to hear the recorded jail call.

D.

Swift argues the district court abused its discretion in admitting into evidence Exhibit 88, a recording of a police interview with Ashanti and Ameshia five days after the shooting. Ashanti denied at trial that she ever identified Swift as the shooter, and she tried to explain away her statements identifying him as the shooter as the result of police pressure during her police interview. In the video, Ashanti referred to Swift and said, "I don't have no doubt in my mind it probably was him." She went on to say she knew the shooter was Swift because she recognized his eyes and the distinctive way he walked. She also identified the shooter as wearing a jacket Swift owned. The video of the interview was admissible to impeach her testimony on both subjects—that she had, in fact, previously identified Swift as the shooter and that the police had not pressured her into identifying Swift in the interview. This evidence was properly admitted for the limited purpose of impeachment, not as substantive proof that Swift was the shooter.

Swift argues that the video, which clocks in at almost thirty minutes, included other hearsay not otherwise in the record and not otherwise admissible that the jury might have relied on as substantive evidence and not for the limited impeachment purpose of evaluating witness credibility. The State edited the video to remove discussions of prior domestic incidents between Swift and Ashanti and other discussions that

commented on evidence in the case. Swift correctly contends that even tighter editing would have been more appropriate. But the video's length was necessary, to some extent, for the State to counter Swift's conflicting allegations that the police questioner badgered Ashanti into incriminating Swift, on the one hand, and alternatively that the police "kind of entertained them with this elaborate display of sympathy and compassion and so forth," on the other. The State argues persuasively that these attacks on the interviewers made a more fulsome picture of the interview all the more necessary to provide sufficient context so the jury could decide for itself. The district court didn't abuse its discretion in permitting the jury to see and hear the interview.

Finally, when we grant further review, we have discretion to let the court of appeals decision stand on specific issues. *State v. Doolin*, 942 N.W.2d 500, 506–07 (Iowa 2020). We do so on Swift's arguments that he suffered ineffective assistance of counsel because his lawyer didn't request a more specific limiting instruction on impeachment evidence than the uniform instruction and on his argument that we should apply the plain-error doctrine to his various challenges to the State's impeachment evidence.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur. McDonald, J., files a special concurrence, which Waterman, J., joins.

**McDONALD, Justice (concurring specially).**

I join the majority opinion, but I write separately because I would accept the State's invitation to reconsider and clarify *State v. Turecek*, 456 N.W.2d 219 (Iowa 1990), and our jurisprudence in this area.

As the majority explains, *Turecek* has been interpreted to preclude the State from impeaching its own witness where the State's primary purpose is to place "before the jury substantive evidence which is not otherwise admissible." *Turecek*, 456 N.W.2d at 225 (quoting *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981) (per curiam)). As presently understood, the inquiry focuses on the primary purpose, or subjective motivation, of the prosecutor offering the evidence. In accord with our precedents, the majority examines the prosecutor's subjective motivation in calling the three challenged witnesses. When did the prosecutor meet with the witnesses? What was said? Was the prosecutor aware the witnesses would recant? If so, did the prosecutor believe the witnesses would provide enough helpful testimony such that it could be said the prosecutor's primary purpose was to admit the helpful testimony with a secondary purpose of impeaching the witness? While these questions necessarily arise out of *Turecek* jurisprudence, as presently understood, these questions are misguided.

In my view, the admissibility of impeachment evidence, like all questions regarding the admissibility of evidence, is governed by the rules of evidence. I would hold the proper inquiry is whether, as an objective matter and irrespective of the prosecutor's subjective motivation, the evidence is relevant and whether the evidence should nonetheless be excluded because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, the propensity to

mislead the jury, undue delay, waste of time, or the needless presentation of cumulative evidence. *See* Iowa R. Evid. 5.403. Several considerations support moving toward an objective, rule-based standard and away from the subjective-motivation standard.

A number of federal circuits have rejected the subjective-motivation standard and have instead adopted the objective, rule-based standard. The United States Court of Appeals for the Second Circuit has done so. *See United States v. Zackson*, 12 F.3d 1178, 1185 (2d Cir. 1993) ("Nevertheless, the decision to permit a witness to testify at all is conditioned upon satisfaction of Rule 403's probative/prejudice balance. Because the government's proffer demonstrated that Zackson would offer no probative testimony, and because the government used Zackson as a mere conduit to get potentially prejudicial hearsay before the jury, we conclude that the testimony should not have been allowed."). As the Fourth Circuit explained:

> Federal evidence law does not ask the judge, either at trial or upon appellate review, to crawl inside the prosecutor's head to divine his or her true motivation. Rather, in determining whether a Government witness' testimony offered as impeachment is admissible, or on the contrary is a "mere subterfuge" to get before the jury substantive evidence which is otherwise inadmissible as hearsay, a trial court must apply Federal Rule of Evidence 403 and weigh the testimony's impeachment value against its tendency to prejudice the defendant unfairly or to confuse the jury.

*United States v. Ince*, 21 F.3d 576, 580–81 (4th Cir. 1994) (emphasis omitted) (citation omitted).

Like the Second and Fourth Circuits, the Eighth Circuit eschews any attempt to dive into the subjective motivation of the prosecutor and instead applies the rules of evidence:

> We believe, however, that the government's motive in eliciting testimony is irrelevant. Although some courts focus

on determining the "true" purpose of the government in introducing testimony, we think that the relevant question is simply whether the evidence is admissible under Fed. R. Ev. 403. In other words, we hold that the proper inquiry is whether, as an objective matter and irrespective of the government's motive, the probative value of a statement for impeaching the credibility of a witness is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," *see* Fed. R. Ev. 403.

*United States v. Logan*, 121 F.3d 1172, 1175 (8th Cir. 1997) (citations omitted). The Eighth Circuit reiterated its standard in *United States v. Buffalo*, 358 F.3d 519, 523–24 (8th Cir. 2004). In that case, the court "disavowed adherence to any rule that would require trial courts to inquire into the state of mind of the party calling the witness to be impeached" and stated "the relevant question is simply whether the evidence is admissible under Fed. R. Ev. 403." *Id.* (second quoting *Logan*, 121 F.3d at 1175).

In addition to these three circuit courts, it appears the Tenth Circuit has adopted an objective, rule-based standard as well. In *United States v. Woody*, 250 F. App'x 867, 883–84 (10th Cir. 2007) (per curiam), the court cited *Logan* and applied the rule 403 analysis. The court stated,

> Rule 403 requires the court to balance the relative probative and prejudicial value of evidence. This "serves to prevent a party from calling a witness, knowing him or her to be adverse, merely to make an end-run around the rule against hearsay by impeaching the witness with a prior inconsistent statement that the jury would not otherwise have been allowed to hear."

*Id.* at 883 (quoting *United States v. Durham*, 470 F.3d 727, 732 (8th Cir. 2006)).[1]

---

[1]Some circuit courts of appeal still adhere to one form or another of the subjective-motivation standard. *See, e.g.*, *United States v. Burt*, 495 F.3d 733, 737 (7th Cir. 2007) ("But neither of those cases makes any mention of a primary purpose. Both cases reiterate that the test is whether the prosecution calls the witness in bad faith."); *Evans v. Verdini*, 466 F.3d 141, 146 (1st Cir. 2006) (stating the doctrine focuses on the primary

Unlike the subjective-motivation standard, the objective, rule-based standard is supported by the text of the relevant rules. Iowa Rule of Criminal Procedure 2.21(1) provides the "rules of evidence prescribed in civil procedure shall apply to criminal proceedings as far as applicable and not inconsistent with the provisions of statutes and these rules." Rule 2.21 provides some specific rules regarding the corroboration of accomplice testimony and the confession of a defendant, but it does not provide any limitation on the prosecutor's use of impeachment evidence. *See* Iowa R. Crim. P. 2.21.

Similarly, the rules of evidence do not provide for any limitation on the prosecutor's use of impeachment evidence. To the contrary, Iowa Rule of Evidence 5.607 provides "[a]ny party, including the party that called the witness, may attack the witness's credibility." As the Second Circuit explained, the rules of evidence are directly contrary to the subjective-motivation standard:

> To the extent that defendants rely on *Morlang* for the principle that a witness cannot be put on the stand if the side calling him knows that he will give testimony that it will have to impeach, it seems clear to us that the effect of Fed. R. Evid. 607, codifying the right to impeach one's own witnesses without special restriction, is to nullify the plausibility of such a reading. The *Morlang* opinion itself recognizes that enactment of Fed. R. Evid. 607 might have such an effect.

---

purpose of the witness's testimony considered as a whole); *United States v. Gilbert*, 57 F.3d 709, 711–12 (9th Cir. 1995) (per curiam) (applying primary purpose test); *United States v. Hogan*, 763 F.2d 697, 702 (5th Cir.) (holding "[t]he prosecution . . . may not call a witness it knows to be hostile for the primary purpose of eliciting otherwise inadmissible impeachment testimony, for such a scheme merely serves as a subterfuge to avoid the hearsay rule" (emphasis omitted)), *rev'd on other grounds*, 771 F.2d 82 (5th Cir. 1985). It appears the Sixth Circuit has not resolved the question. *See United States v. Moore*, 495 F. App'x 680, 686 (6th Cir. 2012) (applying the subjective primary purpose test); *United States v. Letner*, 273 F. App'x 491, 496–97 (6th Cir. 2008) (stating it need not determine which standard applied because the evidence was admissible under either standard).

*United States v. DeLillo*, 620 F.2d 939, 946–47 (2d Cir. 1980). The only rule-based reason for excluding relevant evidence is rule 5.403, which allows for the exclusion of relevant evidence under the following circumstances:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Iowa R. Evid. 5.403. Rather than continuing to adhere to the subjective-motivation test, I would apply the rules of evidence, which allow any party to impeach its own witness subject to the balancing approach in rule 5.403.

In addition to these reasons, our precedents are not inconsistent with the objective, rule-based approach endorsed in this opinion. The genesis of our current subjective-motivation rule is *Turecek*. In that case, the defendant was charged with sexual abuse in the second degree. *See Turecek*, 456 N.W.2d at 221. The State tried to admit thirteen exhibits of sexually explicit materials, such as books, pictures, and catalogs. *See id.* at 223. The district court found the exhibits were not relevant to any issue in the case but admitted the exhibits for the purposes of impeachment. *See id.*

This court concluded the exhibits were not relevant to any issue in the case and should not have been admitted for the purpose of impeachment. *Id.* at 225. We reached that conclusion not by looking at the subjective motivation of the prosecutor but instead by examining the probative value of the evidence balanced against its prejudicial effect. *Id.* at 223–25. With respect to one witness, we explained "the items of testimony which the State asserts to be contradicted by these sexually

explicit exhibits are collateral to the issues in the case. The evidence was not admissible for some proper purpose independent of the contradiction." *Id.* at 224. With respect to a second witness the State sought to impeach, we again explained the impeachment was improper because it "pertained to matters collateral to the issues." *Id.* The State also claimed the exhibits were admissible to bolster the credibility of another witness, but we rejected the argument, concluding "[i]t is not permissible for a litigant to offer otherwise inadmissible evidence for the sole purpose of corroborating the testimony of one of its own witnesses on a purely collateral matter." *Id.* at 225.

It was within the context of the State's attempt to inject highly prejudicial and inflammatory collateral matters into the trial that we said that the State is not allowed to impeach its own witness for the purpose of putting before the jury inadmissible evidence. *See id.* Reconsidered, the rule announced in *Turecek* is a narrow one: the defendant suffers undue prejudice if the district court admits highly prejudicial and inflammatory impeachment evidence on "purely collateral matters," i.e., matters that have no probative value independent of impeachment. *See State v. Lasage,* 523 N.W.2d 617, 621 (Iowa Ct. App. 1994) (discussing *Turecek* and stating "[i]mpeachment evidence is inadmissible if it goes only to a collateral issue" and "if the evidence goes to some purpose independent of the contradiction, it is admissible"), *overruled on other grounds by State v. Williams*, 895 N.W.2d 856 (Iowa 2017).

This objective, rule-based understanding of *Turecek* is consistent with the remainder of our jurisprudence regarding impeachment. Impeachment evidence is generally allowed when "the statement goes to a question at issue in the case" and not when it is "collateral thereto." *State v. Gilmore,* 259 N.W.2d 846, 853 (Iowa 1977). We subsequently explained

in *State v. Blackford*, 335 N.W.2d 173, 175–76 (Iowa 1983), that the test for impeachment by prior inconsistent statement is whether the impeachment evidence is "collateral to the issues in the case." We further explained:

> Probably the most thorough review which we have undertaken concerning the limits of impeaching witnesses based on prior inconsistent statements is contained in *State v. Gilmore*, 259 N.W.2d 846, 853–58 (Iowa 1977). We there approved the rule found in several authorities discussed in the opinion that the true test as to collateralness is "could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction." *Gilmore*, 259 N.W.2d at 853.

*Blackford*, 335 N.W.2d at 176. The danger of allowing impeachment on a collateral matter is that "the jury may become distracted and confused by the attention given to the contradiction," and "[a]s a result, the jury may attach undue importance to extraneous matters." 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6096, Westlaw (2d ed. Oct. 2020 Update) [hereinafter Wright & Gold]. In contrast, "[e]vidence of prior statements inconsistent with those made by a witness at the trial on a material matter may, of course, be introduced for the purpose of impeachment." *State v. Tharp*, 258 Iowa 224, 235, 138 N.W.2d 78, 85 (1965).

Another case in our *Turecek* jurisprudence is important to consider. *State v. Tracy*, 482 N.W.2d 675 (Iowa 1992) (en banc), is generally considered to absolutely prohibit a prosecutor from calling a known recanting witness and then impeaching that witness's testimony with prior inconsistent statements. A closer look reveals that is an overly broad reading of *Tracy*. In that case, the defendant was convicted of sexual abuse in the third degree arising out of sexual abuse of his stepdaughter. *Id.* at 677. The stepdaughter had reported to several persons that she and

her stepfather had engaged in sexual intercourse on several occasions. *See id.* at 678. Prior to trial, the stepdaughter recanted and stated everything she had said was a lie. *Id.*

> At trial, K.A. testified that she had made up the story about her stepfather sexually abusing her in order to get out of his home. She explained that the hard work and long hours associated with Tracy's hog and dairy operation eliminated any time she might otherwise have had for social and extra-curricular school activities.

*Id.* The prosecutor then impeached K.A.'s testimony in several respects. *Id.* at 678–79. The prosecutor called a doctor who opined on the truthfulness of K.A.'s testimony, which was in violation of *State v. Myers*, 382 N.W.2d 91, 97–98 (Iowa 1986) (en banc). *See Tracy*, 482 N.W.2d at 678–79. The State also confronted K.A. with her inconsistent statements. *Id.* at 679. Finally, the State further supported its impeachment of K.A. with the testimony of K.A.'s mother, K.A.'s best friend, the school nurse, a child abuse investigator, and an employee of the sheriff's office, "all of whom recounted the graphic complaints of sexual abuse K.A. had previously related to them." *Id.*

This court concluded the impeachment evidence was improper and the defendant was entitled to a new trial. *Id.* at 679, 682. In reaching that conclusion, we did not examine the subjective motivation of the prosecutor but instead examined the probative value of the impeachment evidence balanced against its prejudicial effect. *See id.* at 679–80. In particular, it was the cumulative effect of the impeachment evidence, including extrinsic evidence of prior inconsistent statements, that was prejudicial to the defendant. *Id.* at 680. We emphasized that the district court admitted "*various items* of evidence that would otherwise be inadmissible." *Id.* at 679 (emphasis added). We looked at the "*collective* prejudicial impact of [the doctor's] testimony in conjunction with that given by the others." *Id.*

at 680 (emphasis added).  We found the defendant suffered prejudice because of the "*prodigious volume* of testimony that was admitted under the guise of 'impeachment.'" *Id.* (emphasis added).  We concluded "that the *cumulation* of this evidence with the other inadmissible testimony . . . entitle[d] Tracy to a new trial." *Id.* (emphasis added).

It was within the context of the State's attempt to inject a significant amount of cumulative evidence into the trial that we said the State is not allowed to impeach its own witness for the purpose of putting before the jury inadmissible evidence.  Reconsidered, the rule announced in *Tracy* is a narrow one: the defendant suffers undue prejudice if the district court allows the needless presentation of cumulative impeachment evidence.

For the purposes of brevity, I will not discuss the remainder of our *Turecek* precedents, but in my view, the objective, rule-based standard is more consistent with the remainder of our *Turecek* cases than the subjective-motivation standard.  For example, even when the prosecutor's primary purpose for calling a witness is to impeach the witness, *Turecek* is not violated where the evidence would otherwise be admissible.  *See State v. Russell,* 893 N.W.2d 307, 316 (Iowa 2017) ("The *Turecek* rule is a shield designed to prevent the introduction of otherwise inadmissible evidence, but it cannot be used to prevent the State from using admissible evidence to impeach a witness.  Prior statements of a witness that are admissible as substantive evidence may be freely employed to impeach a witness on direct examination." (citation omitted)); *State v. Tompkins,* 859 N.W.2d 631, 639 (Iowa 2015) ("When a witness's hearsay statement is admissible to prove the truth of the matter asserted, there is no *Turecek* violation."); *State v. Rojas,* 524 N.W.2d 659, 662 (Iowa 1994) ("Rojas argues that the State committed a *Turecek* violation by calling B.R. to testify, knowing she would recant her allegations, solely for the purpose of

admitting the videotape interview to impeach her recantation. There is no *Turecek* violation here because we find the videotape was admissible under rule 803(24)." (citations omitted)); *State v. Kone*, 557 N.W.2d 97, 101 (Iowa Ct. App. 1996) ("Kone contends the State's impeachment of Close at trial established a violation of the rule set forth in *State v. Turecek* and reiterated within *State v. Tracy*. . . . We find Close's testimony was relevant and admissible as to the events which transpired on the night of the murder. Furthermore, the tape recording appears to have been otherwise admissible under rule 803(24) as direct evidence of Kone's guilt. As such, we find no *Turecek* violation occurred." (citations omitted)). What this line of precedents demonstrates is that the admissibility of evidence is always an objective, rule-based determination and not an inquiry into the subjective-motivation of the prosecutor.

Finally, the objective, rule-based standard is more consistent with the truth-seeking function of the criminal trial than the subjective-motivation approach. The State is not required to speculate that a reluctant witness or recanting witness will provide false testimony. *See United States v. Patterson*, 23 F.3d 1239, 1245 (7th Cir. 1994). "In fact, quite the opposite is true; 'an attorney is entitled to assume that a witness will testify truthfully.' " *Id.* (quoting *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992)). The subjective-motivation standard denies the State the opportunity to call a reluctant witness who may testify truthfully despite pretrial statements to the contrary.

Further, even if the recanting witness does in fact recant at trial, allowing the prosecutor to impeach the witness subject to rule 5.403 is

consistent with rules of evidence and the truth-seeking function of the criminal trial:

> The policy underlying Rule 607 is the same policy of the relevance rules: promotion of accurate fact-finding. Congress abandoned the voucher rule because impeachment evidence can be highly probative even when offered by the party calling the witness in question. The probative value of such evidence stems from the jury's need to determine the weight to be given testimony that bears on facts that are of consequence to the issues in the case. But the creation of Rule 403 shows that the drafters had less than perfect faith in the jury's ability to properly weigh evidence. Rule 403 presupposes that sometimes a court must intervene to exclude evidence that the jury might misconstrue or misuse. Rule 403 adds a concern for administrative efficiency to the policy goal of accurate fact-finding. This permits courts to exclude evidence where it is not needed and, thus, would be a waste of time. Importantly, Rule 403 does not compel exclusion of evidence but makes it discretionary after the court weighs its costs and benefits. By eschewing inflexible principles of exclusion like the voucher rule, the drafters demonstrated they had faith in the jury's ability to accurately determine the facts. But at the same time the drafters left the courts enough discretion under Rule 403 to act when that faith reached its limits.

Wright & Gold § 6093.

Indeed, not only is it permissible for a prosecutor to impeach his or her own witness with a prior inconsistent statement, there are legitimate reasons why a prosecutor can and should be allowed to call a witness solely for the purpose of impeaching that witness on a noncollateral matter:

> In fact, there are perfectly legitimate reasons to impeach a witness with a prior inconsistent statement even where the testimony of the witness is not a surprise to the party that put that witness on the stand. A party may call a witness even if that witness is expected to produce damaging testimony in order to preempt the adversary from calling that witness. By exposing the impeachment evidence herself, the party calling a witness can portray that evidence in a way far different from the way it might be portrayed if it was first revealed by the adversary. If the witness being impeached is favorable to the party calling her, the impeachment can be accomplished in a manner to reduce its sting. If the witness is unfavorable, the

impeachment can be more successful because the adversary was not able to first shape the witness' testimony in anticipation of that attack. Those efforts may even increase the chances that the witness will recant her in-court testimony and return to the version of the facts described in a prior statement. The truth may be advanced by these strategies since they can neutralize the effects of witness coaching. And while the impeachment evidence may have some unfairly prejudicial effects, lack of surprise does not mean it is clear that those effects outweigh the potential of the impeachment evidence to advance the truth.

*Id.*

In sum, I would accept the State's invitation to reconsider and clarify our jurisprudence in this area. The *Turecek* rule, properly understood, does not create a categorical rule that bars the State from impeaching its own witness with prior consistent statements depending upon the subjective-motivation of the prosecutor calling the witness. Instead, the admissibility of impeachment evidence, like all questions regarding the admissibility of evidence, should be governed by the rules of evidence. This objective, rule-based standard is supported by persuasive authority, the text of the relevant rules, our case law, and the truth-seeking purposes underlying the rules of evidence and the criminal trial.

In applying this rule to the facts of this case, I cannot conclude the district court abused its discretion in allowing the witnesses' prior inconsistent statements into evidence for the purposes of impeachment. The witnesses were percipient witnesses who had personal knowledge of the facts of the case. Their testimony and the impeachment evidence were not collateral to the issues at trial. The probative value of the impeachment evidence was not outweighed by any considerations set forth in rule 5.403. For these reasons, I concur specially.

Waterman, J., joins this special concurrence.